**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| JUDITH NELSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COVENANT SURGICAL PARTNERS, INC., ANNE ARUNDEL GASTROENTEROLOGY ASSOCIATES, P.A., and THE MARYLAND CENTER FOR DIGESTIVE HEALTH, LLC,<br><br>Defendants. | Case No.: ____________<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Judith Nelson ("Plaintiff"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendants, Covenant Surgical Partners, Inc. ("CSP"), Anne Arundel Gastroenterology Associates, P.A. ("AAGA"), and The Maryland Center for Digestive Health, LLC ("MCDH") (collectively, "Defendants"), based on her personal knowledge and the investigation of counsel, and allege as follows:

## I. INTRODUCTION

1. With this action Plaintiff seeks to hold Defendants responsible for the harms they caused Plaintiff and similarly situated persons in the foreseeable, preventable data breach of Defendants' inadequately protected shared computer network.

2. On or around April 25, 2025, cybercriminals targeted and infiltrated CSP's computer network and accessed and/or acquired multiple sensitive files containing the unencrypted personally identifiable information ("PII") and protected health information ("PHI") of Plaintiff and Class Members.[1]

---

[1] *See* Notice Letter sent to Plaintiff Nelson from Defendant attached as **Exhibit A.**

3. According to Defendants, the PII and PHI accessed by cybercriminals included Plaintiff's and Class Members' name, date of birth, address, email address, health insurance information (insurer name, subscriber name, policy information including type and policy number, Medicaid or Medicare numbers, and billing and claims information), and/or patient medical information (medical record number, patient account number, provider name, diagnosis information, imaging or test results, and treatment and prescription information) (collectively, "Private Information").[2]

4. Defendant CSP is a "provide physician partners with a full suite of business support services such as human resources, billing, compliance, regulatory, payor relations, contract negotiations, information technology, clinical services, accounting, and payroll, allowing [their] partners to focus on providing quality, personalized care for their patients."[3] Defendant AAGA is a gastroenterology practice and top surgical center in the country. [4] Defendant MCDH is a AAGA -affiliated practice providing GI care across MCDH and AAGA clinics.[5]

5. In the course of Defendants' relationship, CSP furnishes support services to healthcare providers, while Plaintiff and Class Members went to MCDH and AAGA clinics for healthcare services.

6. Plaintiff and Class Members are current and former patients of Defendants who were required to provide their Private Information to Defendants as a condition of receiving healthcare services.

---

[2] *Id.*

[3] *See About*, https://www.linkedin.com/company/covenant-physician-partners/about/ (last visited July 3, 2025).

[4] *See About*, Anne Arundel Gastroenterology Associates, PA, https://www.aagastro.com/ (last visited July 3, 2025).

[5] *See Career Opportunities*, Anne Arundel Gastroenterology Associates, PA, https://www.aagastro.com/contents/career-opportunities#:~:text=Anne%20Arundel%20Gastroenterology%20Associates%20(AAGA,from%20experts%20in%20the%20field (last visited July 3, 2025).

7. As part of their respective businesses, including to furnish medical treatment to patients and bill for services provided, Defendants obtained and stored the Private Information of Plaintiff and Class Members. Upon information and belief, the Private Information Defendants collected from patients at MCDH and AAGA locations was maintained on a CSP server managed and/or accessible by both Defendants.

8. By taking possession and control of Plaintiff's and Class Members' Private Information, Defendants assumed a duty to ensure the Private Information was securely stored and protected through adequate, legally compliant, and industry standard data security measures.

9. Defendants breached this duty and betrayed Plaintiff's and Class Members' trust by failing to properly safeguard and protect their Private Information, thus causing cybercriminals to access, acquire, appropriate, compromise, disclose, exfiltrate, release, steal, misuse, and/or view troves of sensitive, confidential patient data in the Data Breach.

10. Defendants maintained Plaintiff's and the Class Members' Private Information in a negligent manner. In particular, the Private Information was maintained on computer systems and networks that were in a condition vulnerable to cyberattack. The mechanism of the Data Breach, and the potential for improper disclosure of Plaintiff's and Class Members' Private Information, was a known risk to Defendants; and, thus, Defendants were on notice that failing to take appropriate protective measures would expose and increase the risk that the Private Information of Plaintiff and Class Members could be compromised and stolen in this Data Breach.

11. Defendants' misconduct—including their collective failures to implement adequate and reasonable measures to protect Plaintiff's and Class Members' Private Information, timely detect the Data Breach, take adequate steps to prevent and stop the Data Breach, disclose the material fact that they did not have adequate security practices in place to safeguard the Private Information, or provide timely and adequate notice of the Data Breach—caused substantial harm and injuries to Plaintiff and Class Members across the United States.

12. Due to Defendants' failures, cybercriminals obtained and now possess everything they need to personal identity theft and wreak havoc on the financial and personal lives of Plaintiff and Class Members for decades to come.

13. Upon information and belief, Defendants breached their duties and obligations in one or more of the following ways: (a) failing to design or being negligent in the design, implementation, monitoring, and maintenance of reasonable network safeguards against foreseeable threats; (b) failing to design, implement, and maintain reasonable data retention policies; (c) failing to adequately train staff on data security; (d) failing to comply with industry-standard data security practices; (e) failing to warn Plaintiff and Class Members of Defendants' inadequate data security practices; (f) failing to encrypt or adequately encrypt the Private Information; (g) failing to recognize or detect in a timely manner that the network storing Plaintiff's Private Information had been compromised and accessed in a timely manner to mitigate the harm; (h) failing to utilize widely available software able to detect and prevent this type of attack; (i) otherwise failing to secure the hardware and network systems by using reasonable and effective data security procedures to prevent foreseeable vulnerabilities and data security incidents; and (j) failing to notify Plaintiff and Class Members in a timely and accurate manner so that they could mitigate the harm.

14. As a result of the Data Breach, Plaintiff and at least tens of thousands of other Data Breach victims[6] suffered concrete injuries that are personal, social, and financial, including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft including credit monitoring services, credit freezes and other protective measures; (c) loss of time and loss of productivity incurred mitigating the materialized

[6] *See U.S. Department of Health and Human Services Office for Civil Rights*, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf notices (reporting 88,609 affected) (last visited July 3, 2025).

risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; (i) anxiety, annoyance and nuisance; (j) misuse of their Private Information consisting of an increase in spam calls, texts, and/or emails; and (k) the continued risk to their Private Information, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect it.

15. As a result of the unreasonable and inadequate data security practices that resulted in the Data Breach, Plaintiff and Class Members have already suffered damages. For example, their Private Information is now in the hands of criminals who can offer it for sale, hold it for ransom, or use it for any other criminal purpose they desire.

16. Plaintiff and Class Members are at imminent and substantial risk of harm as the Private Information accessed is capable of being used by criminals for illicit purposes.

17. Plaintiff brings this action individually and on behalf of the Class and seek actual damages and restitution. Plaintiff also seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, future costs of identity theft monitoring, and injunctive relief including improvements to Defendants' data security systems, future annual audits, long-term credit monitoring services funded by Defendants, and other remedies as the Court sees necessary and proper.

## II. THE PARTIES

18. Plaintiff Judith Nelson is and at all relevant times has been a resident and citizen of the state of Maryland, where she intends to remain.

19. Defendant CSP is a Delaware corporation with its headquarters and principal place of business is located at 401 Commerce St. Ste 600, Nashville, Tennessee 73219.

20. Defendant AAGA is a Maryland professional association, with its headquarters and principal place of business is located at 820 Bestgate Road, Suite 2B Annapolis, Maryland 21401.

21. Defendant MCDH is a Maryland limited liability company with its headquarters and principal place of business is located at 820 Bestgate Road, Suite 2B, Annapolis, Maryland 21401.

22. Defendants are directly liable for their own acts, omissions, and negligence.[7]

## III. JURISDICTION AND VENUE

23. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and members of the proposed Class are citizens of states different from Defendants.[8] This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

24. This Court has personal jurisdiction over Defendant CSP because its principal place of business is in this District, regularly conducts business in Tennessee, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

[7] Whenever reference is made in this Complaint to any action, inaction, or conduct of the Defendants named in this Complaint, the allegation is that the Defendants engaged in the action, inaction, or conduct at issue by or through one or more of their officers, directors, agents, employees, or representatives who were engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

[8] According to the breach report submitted to the U.S. Department of Health and Human Services Office for Civil Rights, 88,609 individuals were impacted in the Data Breach. *See Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected*, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited July 3, 2025).

25. This Court has personal jurisdiction over Defendant AAGA because it regularly conducts business in Tennessee, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

26. This Court has personal jurisdiction over Defendant MCDH because it regularly conducts business in Tennessee, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

27. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, CSP is based in this District, Defendants maintain Plaintiff's and Class Members' Private Information in this District, and Defendants caused harm to Plaintiff and Class Members in this District.

## IV. FACTUAL ALLEGATIONS

### A. Defendants Collect and Store Private Information in the Course of Their Joint Business, and Promise to Protect It.

28. Defendant CSP is a "provide physician partners with a full suite of business support services such as human resources, billing, compliance, regulatory, payor relations, contract negotiations, information technology, clinical services, accounting, and payroll, allowing [their] partners to focus on providing quality, personalized care for their patients."[9] Defendant AAGA is a gastroenterology practice and top surgical center in the country. [10] Defendant MCDH is a AAGA -affiliated practice providing GI care across MCDH and AAGA clinics.[11]

---

[9] *See About*, https://www.linkedin.com/company/covenant-physician-partners/about/ (last visited July 3, 2025).

[10] *See About*, Anne Arundel Gastroenterology Associates, PA, https://www.aagastro.com/ (last visited July 3, 2025).

[11] *See Career Opportunities*, Anne Arundel Gastroenterology Associates, PA, https://www.aagastro.com/contents/career-opportunities#:~:text=Anne%20Arundel%20Gastroenterology%20Associates%20(AAGA,from%20experts%20in%20the%20field (last visited July 3, 2025).

29. In the course of Defendants' relationship, CSP furnishes support services to healthcare providers, while Plaintiff and Class Members went to MCDH and AAGA clinics for healthcare services.

30. As part of their joint business, including to furnish medical treatment to patients, Defendants obtain and store patients' Private Information, including that of Plaintiff and Class Members.

31. Upon information and belief, the Private Information Defendants collected from patients at MCDH and AAGA locations is maintained and shared on a server managed and accessible by Defendants.

32. Accordingly, Defendants are responsible for reasonable and adequate cybersecurity measures were in place to protect the Private Information they jointly collected and stored.

33. Additionally, AAGA's Privacy Policy, governing the privacy and security of patient Private Information, applies to all AAGA-affiliated practices, including MCDH.

34. As part of their business and in order to gain profits, including by providing medical care to patients and billing and receiving payment for the services provided, Defendants obtained and stored the Private Information of Plaintiff and Class Members.

35. As a condition of receiving medical services at MCDH and AAGA locations, Plaintiff and Class Members were required to provide Defendants with their highly sensitive Private Information, including some of their most private and confidential PII and PHI.

36. Plaintiff and Class Members entrusted Defendants with sensitive and confidential information, including their Private Information which includes information that is static, does not change, is extremely personal and private, and can be used to commit a myriad of crimes—including medical histories.

37. By obtaining, collecting, and storing Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were thereafter responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

38. Defendants had obligations created by industry standards, common law, statutory law, and their own assurances and representations to keep Plaintiff and Class Members' Private Information confidential and to protect such Private Information from unauthorized access.

39. Plaintiff and Class Members made their Private Information available to Defendants with the reasonable expectation that any entity with access to this information would keep that sensitive and Private Information confidential and secure from illegal and unauthorized access. They similarly expected that, in the event of any unauthorized access, they would be provided with prompt and accurate notice. This expectation was objectively reasonable and based on obligations imposed on Defendants by statute, regulations, industry custom, and standards of general due care.

40. Indeed, Defendants promised and assured Plaintiff and Class Members the Private Information they were required to provide would be safeguarded with adequate, legally compliant measures. These promises were both implied through Defendants' mandatory collection of Private Information and expressly made through documents like the AAGA Privacy Notice, which applies to both AAGA and its affiliates.

41. Plaintiff and Class Members relied on Defendants' promises, express and implied, to keep their Private Information confidential and securely maintained, to use this information for business and medical purposes only, and to make only authorized disclosures of this information.

42. Defendants failed to carry out their duty to safeguard sensitive Private Information. Defendants failed to implement necessary data security safeguards at the time of the Data Breach.

As a result, they caused Plaintiff's and Class Members' Private Information to be accessed and stolen during the Data Breach.

**B. Defendants Failed to Protect Plaintiff's and Class Members' Private Information, Causing the Data Breach.**

43. Although the Data Breach took place in February 2025, Defendants only disclosed its occurrence and began notifying victims in May 2025—*three months* later.

44. According to the joint website notice of the Data Breach, on February 22, 2025, CSP discovered that certain systems within its network had been subjected to unauthorized activity.[12] Following an investigation, Defendants determined cybercriminals infiltrated their insufficiently secured systems and improperly "access and remove[d] data" on February 22, 2025.[13] Defendants' investigation further determined the accessed and removed data contained the unencrypted Private Information of Plaintiff and Class Members.[14]

45. According to Defendants, the Private Information accessed and copied by cybercriminals involved a wide variety of PII and PHI, including "(1) information to identify and contact individuals (such as name, date of birth, address, and email address); (2) Social Security number; (3) driver's license or state ID number or other government-issued identifier, and/or financial account information; (4) health insurance information (insurer name, subscriber name, policy information including type and policy number, Medicaid or Medicare numbers, and billing and claims information); and/or (3) patient medical information (medical record number, patient account number, provider name, diagnosis information, imaging or test results, and treatment and prescription information)."[15]

---

[12] *See* https://response.idx.us/CSP-matter/ (last visited July 3, 2025).
[13] *Id.*
[14] *Id.*
[15] *Id.*

46. Despite the breadth and sensitivity of the Private Information that was exposed, and the attendant consequences to patients as a result, Defendants failed to disclose the Data Breach or notify victims until three months after the breach was identified. This delay further exacerbated the harms to Plaintiff and Class Members.

47. To make matters worse, omitted from Defendants' belated notice were details like the root cause of the Data Breach, the identity of the cybercriminals behind it, why it took Defendants three months to notify affected patients, the date Defendants identified that Private Information had been accessed, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

48. Thus, Defendants' so-called "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

49. Unauthorized third-party cybercriminals accessed and removed Plaintiff's and Class Members' Private Information in the Data Breach, and have engaged in (and will continue to engage in) misuse of the Private Information, including publishing, marketing, and selling Plaintiff's and Class Members' Private Information to an untold number of other bad actors on the dark web.

50. Defendants acted jointly and in concert, for the same purpose and as part of the same business, in collecting Plaintiff's and Class Members' Private Information and failing to adequately protect it.

51. The Data Breach occurred as direct, proximate, and foreseeable results of multiple failings on the part of Defendants.

52. For one, Defendants failed to spend sufficient resources on preventing external access, detecting outside infiltration, and training their employees on appropriate data security practices. For example, as evidenced by the Data Breach's occurrence, the infiltrated network was not protected by sufficient multi-layer data security technologies or effective firewalls.

53. Similarly, based on the delayed discovery of the Data Breach, it is evident that the infiltrated network that Defendants used to store Plaintiff's Private Information did not have sufficiently effective endpoint detection.

54. Further, the fact that Private Information was "accessed and removed" in the Data Breach demonstrates that the Private Information contained in the Defendants' network was not encrypted. Had the information been properly encrypted, the data thieves would have accessed only indecipherable data.

55. Moreover, based on the plain language of Defendants' breach notice, Defendants improperly maintained patient PII and PHI, including "protected health information," "medical information" and "health insurance information" ***outside of their electronic health record system***, in violation of statutory, regulatory, and common law duties and obligations.

56. Further, Defendants failed to inform the public their data security practices were deficient and inadequate. Had Plaintiff and Class Members been aware that Defendants did not have adequate safeguards in place to protect such sensitive Private Information, they would never have provided such information to Defendants.

57. In addition to the failures that led to the Breach, Defendants' failings in handling the Breach and responding to the incident exacerbated the resulting harm to the Plaintiff and Class Members.

58. Defendants' delay in informing victims of the Data Breach that their Private Information was compromised virtually ensured that the cybercriminals who stole their Private Information could monetize, misuse, and/or disseminate that Private Information before the

Plaintiff and Class Members could take affirmative steps to protect their Private Information. As a result, Plaintiff and Class Members will suffer indefinitely from the substantial and concrete risk that Private Information has been stolen and misappropriated.

59. Additionally, Defendants' attempt to ameliorate the effects of this Data Breach with limited complimentary credit monitoring is woefully inadequate. Plaintiff's and Class Members' Private Information was accessed and acquired by cybercriminals for the express purpose of misusing the data. As a consequence, they face the real, immediate, and likely danger of identity theft and misuse of their Private Information. This will cause irreparable harm to their personal, financial, reputational, and future well-being. This harm is even more acute because much of the stolen Private Information, such as Social Security numbers and healthcare data, is immutable.

60. In short, Defendants' myriad failures, including the failure to timely detect an intrusion and failure to timely notify Plaintiff and Class Members that their personal and medical information had been stolen due to Defendants' security failures, caused unauthorized criminals to access, misappropriate, and misuse Plaintiff's and Class Members' Private Information for three months before Defendants finally granted victims the opportunity to take proactive steps to defend themselves and mitigate the near- and long-term consequences of the Data Breach

61. The stolen Private Information at issue has great value to the hackers, due to the large number of individuals affected and the fact that the sensitive information was compromised. The "unauthorized third party" who carried out the cyberattack targeted Plaintiff's and Class Members' Private Information because of that data's value on the dark web and for criminals looking to further exploit Data Breach Victims.

**C. Data Breaches Pose Significant Threats.**

62. Data breaches have become a constant threat that, without adequate safeguards, can expose personal data to malicious actors. It is well known that PII, and Social Security numbers in particular, are an invaluable commodity and a frequent target of hackers.

63. In 2023, the Identity Theft Resource Center's Annual End-of-Year Data Breach Report listed 3,205 total compromises involving 353,027,892 victims for 2023, which was a 72 percent increase in total compromises from the previous record set in 2021.[16] The HIPAA Journal's 2022 Healthcare Data Breach Report reported 707 compromises involving healthcare data, which is just eight shy of the record of 715 set in 2021 and still double that of the number of similar such compromises in 2017 and triple the number of compromises in 2012.[17]

64. Statista, a German entity that collects and markets data relating to, among other things, data breach incidents and the consequences thereof, confirms that the number of data breaches has been steadily increasing since it began a survey of data compromises in 2005 with 157 compromises reported that year to 2023's total of 3,205.[18] The number of impacted individuals has also risen precipitously from approximately 169 million in 2015 to 353 million in 2023, which is an increase of more than 100%.[19]

65. Each year, identity theft causes billions of dollars of losses to victims in the United States.[20] For example, with the Private Information stolen in the Data Breach, identity thieves can open financial accounts, apply for credit, collect government benefits, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or

---

[14] *2023 End of Year Data Breach Report*, Identity Theft Resource Center (Jan. 2024), https://www.idtheftcenter.org/publication/2023-data-breach-report/.

[17] Rebecca Murray-Watson, *2022 Healthcare Data Breach Report*, The HIPAA Journal (January 24, 2023), https://www.hipaajournal.com/2022-healthcare-data-breach-report/.

[18] Ani Petrosyan, *Annual Number of Data Breaches and Exposed Records in the United States from 2005 to 2023*, Statista (Dec. 10, 2024), https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed/.

[19] *Id.*

[20] *Facts + Statistics: Identity Theft and Cybercrime*, Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited July 3, 2025).

undocumented immigrants, steal benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[21] These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

66. Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.[22] This stolen Private Information is then routinely traded on dark web black markets as a simple commodity.[23]

67. A compromised Social Security number can give criminals and other unsavory groups the ability to fraudulently take out loans under the victims' name, open new lines of credit, and cause other serious financial difficulties for victims:

> A dishonest person who has your Social Security number can use it to get other Private Information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[24]

68. This is exacerbated by the fact that the problems arising from a compromised Social Security number are exceedingly difficult to resolve. A victim is forbidden from proactively changing his or her number unless and until it is actually misused and harm has already occurred. And even this delayed remedial action is unlikely to undo the damage already done to the victims:

---

[21] John Egan, *What Should I Do if My Driver's License Number is Stolen*, Experian (June 13, 2024), https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/.
[22] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/products/gao-07-737.
[23] Edvardas Mikalauskas, *What is your identity worth on the dark web?* Cybernews (September 28, 2021), https://cybernews.com/security/whats-your-identity-worth-on-dark-web/.
[24] United States Social Security Administration, *Identity Theft and Your Social Security Number*, United States Social Security Administration (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

> Keep in mind that a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other Private Information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.[25]

69. A particularly troubling example of this effect is the development of "Fullz" packages. A "Fullz" package is a dossier of information that cybercriminals and other unauthorized parties can assemble by cross-referencing the Private Information compromised in a given data breach to publicly available data or data compromised in other data breaches. Automated programs can and are routinely used to create these dossiers and they typically represent an alarmingly accurate and complete profile of a given individual.

70. Therefore, through the use of these "Fullz" packages, stolen Private Information from this Data Breach can be easily linked to Plaintiff's and the proposed Class Members' phone numbers, email addresses, and other sources and identifiers. Thus, even if certain information such as emails, phone numbers, or credit card or financial account were not compromised in this Data Breach, criminals can easily create a Fullz package to sell it for profit.

71. Upon information and belief, this has already transpired (and will continue to transpire) for Plaintiff and the Class. It is reasonable that the trier of fact will find that Plaintiff and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

72. The data stolen in this Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to

[25] *Id.*

credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[26]

73. The most sought after and expensive information on the dark web are stolen medical records which command prices from $250 to $1,000 each.[27] Medical records are considered the most valuable because unlike credit cards, which can easily be canceled, and social security numbers, which can be changed, medical records contain "a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information."[28] With this bounty of ill-gotten information, cybercriminals can steal victims' public and insurance benefits and bill medical charges to victims' accounts.[29] Cybercriminals can also change the victims' medical records, which can lead to misdiagnosis or mistreatment when the victims seek medical treatment.[30] Victims of medical identity theft could even face prosecution for drug offenses when cybercriminals use their stolen information to purchase prescriptions for sale in the drug trade.[31]

74. The wrongful use of compromised medical information is known as medical identity theft and the damage resulting from medical identity theft is routinely far more serious than the harm resulting from the theft of simple PII. Victims of medical identity theft spend an average of $13,500 to resolve problems arising from medical identity theft, and there are currently

---

[26] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Networkworld, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x- price-of-stolen-credit-card-numbers.html.

[27] Paul Nadrag, Capsule Technologies, *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web*, Fierce Healthcare (January 26, 2021), https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web.

[28] *Id.*

[29] *Medical Identity Theft in the New Age of Virtual Healthcare*, IDX (March 15, 2021), https://www.idx.us/knowledge-center/medical-identity-theft-in-the-new-age-of-virtual-healthcare. *See also* Michelle Andrews, *The Rise of Medical Identity Theft*, Consumer Reports (Aug. 25, 2016), https://www.consumerreports.org/health/medical-identity-theft-a1699327549/.

[30] *Id.*

[31] *Id.*

no laws limiting a consumer's liability for fraudulent medical debt (in contrast, a consumer's liability for fraudulent credit card charges is capped at $50).[32] It is also "considerably harder" to reverse the damage from the aforementioned consequences of medical identity theft.[33]

75. Instances of medical identity theft have grown exponentially over the years from approximately 6,800 cases in 2017 to just shy of 43,000 in 2021, which represents a seven-fold increase in the crime.[34]

76. In light of the dozens of high-profile health and medical information data breaches that have been reported in recent years, healthcare providers like Defendants charged with maintaining and securing Private Information should know the importance of protecting that information from unauthorized disclosure. Indeed, Defendants knew, or certainly should have known, of the recent and high-profile data breaches in the health care industry: UnityPoint Health, Lifetime Healthcare, Inc., Community Health Systems, Kalispell Regional Healthcare, Anthem, Premera Blue Cross, and many others.[35]

77. In addition, the Federal Trade Commission ("FTC") has brought dozens of cases against companies that have engaged in unfair or deceptive practices involving inadequate protection of consumers' personal data, including recent cases concerning health-related information against LabMD, Inc., SkyMed International, Inc., and others. The FTC publicized these enforcement actions to place companies like Defendants on notice of their obligation to safeguard customer and patient information.[36]

---

[32] Medical Identity Theft, AARP (March 25, 2022), https://www.aarp.org/money/scams-fraud/info-2019/medical-identity-theft.html.
[33] *Id.*
[34] *Id.*
[35] *See, e.g.*, Steve Alder, *Healthcare Data Breach Statistics*, HIPAA Journal (Mar. 20, 2025), https://www.hipaajournal.com/healthcare-data-breach-statistics.
[36] *See, e.g.*, *In the Matter of SKYMED INTERNATIONAL, INC.*, C-4732, 1923140 (F.T.C. Jan. 26, 2021).

78. Given the nature of Defendants' Data Breach, and the long delay in notification to victims thereof, it is foreseeable that the compromised Private Information has been or will be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Plaintiff's and Class Members' Private Information can easily obtain Plaintiff's and Class Members' tax returns or open fraudulent credit card accounts in their names.

79. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because credit card victims can cancel or close credit and debit card accounts.[37] The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

80. To date, Defendants have offered their consumers only limited identity theft monitoring services. The services offered are inadequate to protect Plaintiff and Class Members from the threats they will face for years to come, particularly in light of the Private Information at issue here.

81. Despite the prevalence of public announcements of data breach and data security compromises, their own acknowledgment of the risks posed by data breaches, and their own acknowledgment of their duties to keep Private Information private and secure, Defendants failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from misappropriation. As a result, the injuries to Plaintiff and Class Members were directly and

---

[37] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, Forbes (Mar 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1. *See also Why Your Social Security Number Isn't as Valuable as Your Login Credentials*, Identity Theft Resource Center (June 18, 2021), https://www.idtheftcenter.org/post/why-your-social-security-number-isnt-as-valuable-as-your-login-credentials/.

proximately caused by Defendants' failure to implement or maintain adequate data security measures for their current and former patients.

## D. Plaintiff's Experiences

### *Plaintiff Judith Nelson's Experience*

82. Plaintiff Nelson entrusted her Private Information to Defendants as a condition and in exchange for receiving healthcare services at MCDH, with the reasonable expectation and mutual understanding that Defendants would keep such information confidential and secure from unauthorized access.

83. Plaintiff Nelson received a notice letter from Defendants dated May 28, 2025, informing that her Private Information was specifically identified as having been accessed by cybercriminals in the Data Breach.

84. Plaintiff Nelson is very careful about sharing her sensitive information. She stores any documents containing her Private Information in a safe and secure location and has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

85. Because of the Data Breach, Plaintiff Nelson's Private Information is now in the hands of cybercriminals intent on misusing it.

86. Plaintiff Nelson suffered actual injury due to the Data Breach in the instant her Private Information was accessed and obtained by a third party without her consent or authorization. The moment her Private Information was accessed, Plaintiff Nelson was injured from a loss of privacy.

87. Additionally, as a result of the Data Breach, which exposed highly valuable information such as her health insurance information and medical history, Plaintiff Nelson is imminently at risk of crippling future identity theft and fraud for her lifetime.

88. As a result of the Data Breach, Plaintiff Nelson has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Nelson has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach and reviewing account statements and other information. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

89. Plaintiff Nelson anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

90. The letter Plaintiff Nelson received from Defendants specifically directed her to take the actions described above. Indeed, the notice Defendants posted to their websites advised individuals affected by the Data Breach to carefully review statements carefully review statements sent from healthcare providers and insurance companies to ensure that all account activity is valid. In addition, Defendants' Data Breach notice advised victims to sign up for credit monitoring and informed them how to place a credit freeze on their file through a credit reporting agency.

91. In addition, Plaintiff Nelson's Private Information compromised in the Data Breach has been misused as evidenced by the increase in spam calls, texts, and/or emails she has received since the Data Breach. This misuse of her Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate Private Information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit additional sensitive private e information for use in committing identity theft or fraud.

92. Plaintiff Nelson attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity.

93. Moreover, as a result of the Data Breach, Plaintiff Nelson has experienced stress, anxiety, and concern due to the loss of her privacy and concern over the impact of cybercriminals accessing and further misusing her Private Information. Plaintiff Nelson fears that criminals will use her information to commit identity theft.

94. Plaintiff Nelson has also suffered injury directly and proximately caused by the Data Breach, including (a) theft of her valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by her Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of her Private Information that was entrusted to Defendants; (d) damages unjustly retained by Defendants at the cost to Plaintiff Nelson, including the difference in value between what she should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect her Private Information; and (e) continued risk to Plaintiff Nelson's Private Information, which remains in the possession of Defendants and which is subject to further breach so long as they fail to undertake appropriate and adequate measures to protect it.

### E. Defendants Owed Duties to Protect Plaintiff's and Class Members' Private Information under the Law and the Applicable Standard of Care.

95. Defendants owed a duty to Plaintiff and the Class to design, maintain, and test their computer and application systems to ensure that the Private Information in their possession was adequately secured and protected.

96. Defendants owed a duty to Plaintiff and the Class to create and implement reasonable data security practices and procedures to protect the Private Information in their

possession, including adequately training their employees (and others who accessed Private Information within their computer systems) on how to adequately protect Private Information.

97. Defendants owed a duty to Plaintiff and the Class to implement processes that would detect a breach on their systems in a timely manner.

98. Defendants owed a duty to Plaintiff and the Class to act upon data security warnings and alerts in a timely fashion.

99. Defendants owed a duty to Plaintiff and the Class to disclose if their computer systems and data security practices were inadequate to safeguard individuals' Private Information from theft because such an inadequacy would be a material fact in the decision to entrust Private Information with Defendants.

100. Defendants owed a duty to Plaintiff and the Class to disclose in a timely and accurate manner when data breaches occurred.

101. Defendants owed a duty of care to Plaintiff and the Class because they were the foreseeable victims of a data breach.

**F. Defendants Were Required, but Failed to Comply with HIPAA.**

102. Defendants are covered entities under HIPAA (45 C.F.R. § 160.102) and are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

103. HIPAA requires, *inter alia*, that Defendants implement and maintain policies, procedures, systems, and safeguards that ensure the confidentiality and integrity of consumer and patient PII and PHI, protect against any reasonably anticipated threats or hazards to the security or integrity of consumer and patient PII and PHI, regularly review access to data bases containing

protected information, and implement procedures and systems to detect, contain, and correct any unauthorized access to protected information. *See* 45 CFR § 164.302, *et seq.*

104. HIPAA, as applied through federal regulations, also requires Private Information to be stored in a manner that renders it, "unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology. . . ." 45 CFR § 164.402.

105. Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[38] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

106. HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

107. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

108. "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

109. HIPAA's Security Rule requires each Defendant to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

---

[38] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

110. HIPAA also requires Defendants to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendants are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

111. HIPAA and HITECH also obligated Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

112. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also required Defendants to provide notice of the Data Breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***."[39]

113. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

[39] *Breach Notification Rule*, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added) (last updated July 26, 2013).

114. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

115. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule."[40] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI."[41]

116. Upon information and belief, Defendants' security failures include, but are not limited to the following:

a. Failing to maintain an adequate data security system to prevent data loss;

b. Failing to mitigate the risks of a data breach and loss of data;

c. Failing to ensure the confidentiality and integrity of electronic protected health information Defendants create, receive, maintain, and transmit in violation of 45 CFR 164.306(a)(1);

---

[40] *Security Rule Guidance Material*, US Department of Health & Human Services, http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last updated Oct. 24, 2024).

[41] *Guidance on Risk Analysis*, U.S. Department of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last updated July 22, 2019).

d. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f. Failing to identify and respond to suspected or known security incidents;

g. Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

i. Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

j. Failing to ensure compliance with HIPAA security standard rules by Defendants' workforce, in violation of 45 CFR 164.306(a)(94); and

k. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

117. Upon information and belief, Defendants also failed to store the information it collected in a manner that rendered it, "unusable, unreadable, or indecipherable to unauthorized persons," in violation of 45 CFR § 164.402.

118. Based on the plain language of Defendants' breach notice, Defendants improperly maintained patient PII and PHI, including protected health information, medical information and health insurance information ***outside of their electronic health record system***, in violation of statutory, regulatory, and common law duties and obligations, including HIPAA.

**G. Defendants Were Failed to Follow FTC Act Requirements.**

119. Defendants were prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive Private Information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

120. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

121. In 2016, the FTC updated its publication, *Protecting Private Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[42] The guidelines note businesses should protect the Private Information that they keep; properly dispose of Private Information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[43] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being

[42] *Protecting Private Information: A Guide for Business*, Federal Trade Commission (Oct. 2016), http://ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[43] *Id.*

transmitted from the system; and have a response plan ready in the event of a breach.[44] Defendants clearly failed to do any of the foregoing, as evidenced by the fact the Data Breach occurred, the fact that the Breach resulted in the theft of unencrypted data, and the amount of data exfiltrated.

122. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.[45]

123. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

124. Additionally, the FTC Health Breach Notification Rule obligates companies that suffered a data breach to provide notice to every individual affected by the data breach, as well as notifying the media and the FTC. *See* 16 CFR 318.1, *et seq.*

125. As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

126. Defendants were fully aware of their obligation to protect the Private Information of their current and former patients, including Plaintiff and Class Members. Defendants are sophisticated and technologically savvy businesses that rely extensively on technology systems

---

[44] *Id.*
[45] *Id.*

and networks to maintain their practices, including storing their patients' PII and PHI in order to operate their business.

127. Defendants had and continue to have a duty to exercise reasonable care in collecting, storing, and protecting the Private Information from the foreseeable risk of a data breach. The duty arises out of the special relationship that exists between Defendants and Plaintiff and Class Members. Defendants alone had the exclusive ability to implement adequate security measures to their cyber security network to secure and protect Plaintiff's and Class Members' Private Information.

**H. Defendants Failed to Follow Industry Standards.**

128. As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information that they collect and maintain.

129. Some industry best practices that should be implemented by businesses dealing with sensitive Private Information, like Defendants, include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendants failed to follow these industry best practices.

130. Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendants failed to follow these cybersecurity best practices.

131. Defendants should have also followed the minimum standards of any of the following frameworks: NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC). These are all established standards in reasonable cybersecurity readiness.

132. Defendants failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**I. The Data Breach was Foreseeable; Defendants Were On Notice of Cyber Attack Threats and their Inadequate Data Security.**

133. The injuries to Plaintiff and Class Members were reasonably foreseeable to Defendants because common law, statutes, and industry standards required Defendants to safeguard their computer systems and employ reasonable procedures and controls to ensure that unauthorized third parties did not gain access to Plaintiff's and the other Class Members' highly sensitive Private Information.

134. Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and the risk of a data breach. Further, Defendants knew, or reasonably should have known, of the consequences that would occur if their shared data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result.

135. Data breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some

of the biggest cybersecurity breaches: Target,[46] Yahoo,[47] Marriott International,[48] Chipotle, Chili's, Arby's,[49] and others.[50]

136. Defendants should certainly have been aware, and indeed were aware, that Defendants were at risk for a data breach that could expose the Private Information they collected and maintained.

137. Defendants were also on notice of the importance of data encryption of Private Information. Defendants knew they kept Private Information in their shared systems and yet it appears Defendants did not encrypt these systems, or the information contained within them.

138. The healthcare industry continues to be a popular target for threat actors, which is why the United States Department of Health and Human Services ("HHS") and other regulators have extensively focused on ensuring health care providers protect patient personal and health information. The last several years have seen multiple, high-profile health care breaches, including NextGen Healthcare, Inc. (approximately 1 million patients, March 2023) American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of

---

[46] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/.

[47] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html.

[48] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/.

[49] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b.

[50] *See, e.g.*, Taylor Armerding, *The 18 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Dec. 20, 2018), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html.

Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020).

**J. Plaintiff and the Class Suffered Harm Resulting from the Data Breach.**

139. Like any data hack, the Data Breach presents major problems for all affected.[51]

140. The FTC warns the public to pay particular attention to how they keep personally identifying information including Social Security numbers and other sensitive data. As the FTC notes, "once identity thieves have your Private Information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[52]

141. The ramifications of Defendants' failure to properly secure Plaintiff's and Class Members' Private Information are severe. Identity theft occurs when someone uses another person's financial and Private Information, such as that person's name, address, Social Security number, and other information, without permission in order to commit fraud or other crimes.

142. According to data security experts, one out of every four data breach notification recipients become a victim of identity fraud.[53]

143. Furthermore, the Private Information has a long shelf life because it contains different types of Private Information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

---

[51] Paige Schaffer, *Data Breaches' Impact on Consumers*, Insurance Thought Leadership (July 29, 2021), available at https://www.insurancethoughtleadership.com/cyber/data-breaches-impact-consumers.

[52] *Warning Signs of Identity Theft*, Federal Trade Comm'n, https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft (last visited Mar. 25, 2025).

[53] *Press Release,* Javelin Strategy & Research (Feb. 20, 2013), https://javelinstrategy.com/press-release/more-12-million-identity-fraud-victims-2012-according-latest-javelin-strategy-research.

144. Accordingly, Defendants' wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff and the Class at an imminent, immediate, and continuing increased risk of identity theft and identity fraud. According to a recent study published in the scholarly journal Preventive Medicine Reports, public and corporate data breaches correlate to an increased risk of identity theft for victimized consumers.[54] The same study also found that identity theft is a deeply traumatic event for the victims, with more than a quarter of victims still experiencing sleep problems, anxiety, and irritation even six months after the crime.[55]

145. There is also a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that has not yet been exploited by cybercriminals presents a concrete risk that the cybercriminals who now possess Class Members' Private Information will do so at a later date or resell it.

146. Data breaches have also proven to be costly for affected organizations as well, with the average cost to resolve being $4.45 million dollars in 2023.[56] The average cost to resolve a data breach involving health information, however, is more than double this figure at $10.92 million.[57]

147. The theft of medical information, beyond the theft of more traditional forms of PII, is especially harmful for victims. Medical identity theft, the misuse of stolen medical records and information, has seen a seven-fold increase over the last five years and this explosive growth far

[54] David Burnes, Marguerite DeLiema, Lynn Langton, *Risk and protective factors of identity theft victimization in the United States*, Preventive Medicine Reports, Volume 17 (January 23, 2020), https://www.sciencedirect.com/science/article/pii/S2211335520300188?via%3Dihub.
[55] *Id.*
[56] *Cost of a Data Breach Report 2023*, IBM Security, https://www.ibm.com/reports/data-breach?utm_content=SRCWW&p1=Search&p4=43700072379268622&p5=p&gclid=CjwKCAjwxOymBhAFEiwAnodBLGiGtWfjX0vRlNbx6p9BpWaOo9eZY1i6AMAc6t9S8IKsxdnbBVeUbxoCtk8QAvD_BwE&gclsrc=aw.ds.
[57] *Id.*

outstrips the increase in incidence of traditional identity theft.[58] Medical identity theft is especially nasty for victims because of the lack of laws that limit a victim's liabilities and damages from this type of identity theft (*e.g.*, a victim's liability for fraudulent credit card charges is capped at $50), the unalterable nature of medical information, the sheer costs involved in resolving the fallout from a medical identity theft (victims spend, on average, $13,500 to resolve problems arising from this crime), and the risk of criminal prosecution under anti-drug laws.[59]

148. In response to the Data Breach, Defendants offered to provide certain individuals whose Private Information was exposed in the Data Breach with a limited term of credit monitoring. However, this is inadequate to protect victims of the Data Breach from the lifelong risk of harm imposed on them by Defendants' failures.

149. Moreover, the credit monitoring offered by Defendants is fundamentally inadequate to protect them from the injuries resulting from the unauthorized access and exfiltration of their sensitive Private Information.

150. Plaintiff and Class Members have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their Private Information being accessed by cybercriminals, risks that will not abate within the limited time of credit monitoring offered by Defendants.

151. Plaintiff and the Class have suffered, and continue to suffer, actual harms for which they are entitled to compensation, including:

a. Trespass, damage to, and theft of their personal property including Private Information;

b. Improper disclosure of their Private Information;

---

[58] Medical Identity Theft, AARP (March 25, 2022), https://www.aarp.org/money/scams-fraud/info-2019/medical-identity-theft.html.

[59] *Id.*

c. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by the actual misuse of their Private Information being accessed by cyber criminals;

d. The imminent and certainly impending risk of having their Private Information used against them by spam callers to defraud them;

e. Damages flowing from Defendants' untimely and inadequate notification of the data breach;

f. Loss of privacy suffered as a result of the Data Breach;

g. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

h. Ascertainable losses in the form of deprivation of the value of Plaintiff's and Class Members' Private Information for which there is a well-established and quantifiable national and international market;

i. Damage to their credit due to fraudulent use of their Private Information;

j. Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score;

k. Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts as a direct and proximate result of the Private Information stolen during the Data Breach;

l. Damages arising from the inability to use accounts that may have been compromised during the Data Breach;

m. Costs associated with time spent to address and mitigate the actual and future consequences of the Data Breach, such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and

identity theft protection services, placing freezes and alerts on their credit reports, contacting their financial institutions to notify them that their Private Information was exposed and to dispute fraudulent charges, imposition of withdrawal and purchase limits on compromised accounts, including but not limited to lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance, and annoyance of dealing with all issues resulting from the Data Breach, if they were fortunate enough to learn of the Data Breach despite Defendants' delay in disseminating notice in accordance with state law and HIPAA;

n. The imminent and impending injury resulting from potential fraud and identity theft posed because their Private Information is exposed for theft and sale on the dark web; and

o. The loss of Plaintiff's and Class Members' privacy.

152. Moreover, Plaintiff and Class Members have an interest in ensuring their Private Information, which remains in the possession of Defendants, is protected from further breaches by the implementation of industry standard and statutorily compliant security measures and safeguards. Defendants have shown themselves to be incapable of protecting Plaintiff's and Class Members' Private Information.

153. Plaintiff and Class Members are desperately trying to mitigate the damage that Defendants have caused them but, given the Private Information Defendants made accessible to hackers, they are certain to incur additional damages. Because identity thieves have their Private Information, Plaintiff and all Class Members will need to have identity theft monitoring protection for the rest of their lives.

154. As a direct and proximate result of Defendants' acts and omissions in failing to protect and secure Private Information, Plaintiff and Class Members have been placed at a

substantial risk of harm in the form of identity theft, and they have incurred and will incur actual damages in an attempt to prevent identity theft.

155. Plaintiff and Class Members retain an interest in ensuring there are no future breaches; in addition to seeking a remedy for the harms suffered as a result of the Data Breach on behalf of both themselves and similarly situated individuals whose Private Information was accessed in the Data Breach.

### K. Cyber Criminals Have Used and Will Use Plaintiff's and Class Members' Private Information to Defraud Them.

156. Plaintiff's and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and the Class Members and to profit off their misfortune.

157. Each year, identity theft causes billions of dollars of losses to victims in the United States.[60] For example, with the Private Information stolen in the Data Breach, identity thieves can open financial accounts, apply for credit, collect government benefits, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[61] These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

---

[60] *Facts + Statistics: Identity Theft and Cybercrime*, Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited Mar. 25, 2025).

[61] John Egan, *What Should I Do if My Driver's License Number is Stolen*, Experian (June 13, 2024), https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/.

158. Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.[62]

159. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security number and medical histories, among other data categories.

160. This is undoubtedly a financially motivated Data Breach, as cybercriminals routinely seek to profit from the sale of Plaintiff's and the Class Members' Private Information on the dark web. The Private Information exposed in this Data Breach is valuable to identity thieves for use in the kinds of criminal activity described herein.

161. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to personally identifiable information, they will use it.[63]

162. Hackers may not use the accessed information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[64]

---

[62] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/products/gao-07-737.

[63] Ari Lazarus, *How fast will identity thieves use stolen info?*, FED. TRADE COMM'N (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

[64] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/products/gao-07-737.

163. As described above, identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit.[65]

164. With this Data Breach, identity thieves have already started to prey on the victims, and one can reasonably anticipate this will continue.

165. Victims of the Data Breach, like Plaintiff and other Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their credit because of their Private Information's wrongful disclosure.[66]

166. In fact, as a direct and proximate result of the Data Breach, Plaintiff and the Class have suffered, and have been placed at an imminent, immediate, and continuing increased risk of suffering, harm from fraud and identity theft. Plaintiff and the Class must now take the time and effort and spend the money to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

### L. Defendants Could Have Prevented the Data Breach but Failed to Adequately Protect Plaintiff's and Class Members' Private Information.

167. Data breaches are preventable.[67] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate

[65] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.
[66] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.
[67] Lucy L. Thompson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

security solutions."[68] Further, "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[69]

168. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[70]

169. As discussed *supra*, Defendants failed to follow HIPAA requirements, failed to follow FTC guidelines, and failed to implement industry-standard data security. Had Defendants followed these standards and requirements, the Data Breach would have been prevented.

170. Many failures laid the groundwork for the success (from a cybercriminal's viewpoint) of the Data Breach, starting with Defendants' failure to incur the costs necessary to implement adequate and reasonable cyber security procedures and protocols necessary to protect Plaintiff's and Class Members' Private Information.

171. Defendants were at all times fully aware of their obligation to protect the Private Information of Plaintiff and Class Members. Defendants were also aware of the significant repercussions that would result from their failure to do so.

172. Defendants maintained the Private Information in a reckless manner. In particular, the Private Information was maintained and/or exchanged, unencrypted, in Defendant's systems and were maintained in a condition vulnerable to cyberattacks.

173. Defendants knew, or reasonably should have known, of the importance of safeguarding Private Information and of the foreseeable consequences that would occur if

---

[68] *Id.* at 17.
[69] *Id.* at 28.
[70] *Id.*

Plaintiff's and Class Members' Private Information was stolen, including the significant costs that would be placed on Plaintiff and Class Members as a result of a breach.

174. The mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendants, and thus Defendants were on notice that failing to take necessary steps to secure Plaintiff's and Class Members' Private Information from those risks left that information in a dangerous condition.

175. Defendants disregarded the rights of Plaintiff and Class Members by, *inter alia*, (i) intentionally, willfully, recklessly, or inexcusably failing to take adequate and reasonable measures to ensure their shared systems were protected against unauthorized intrusions; (ii) failing to disclose they did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiff's and Class Members' Private Information; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

## V. CLASS ACTION ALLEGATIONS

176. Plaintiff brings this action against Defendants on behalf of herself and all other individuals similarly situated under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3). Plaintiff asserts all claims on behalf of the Nationwide Class, defined as follows:

> All individuals residing in the United States whose Private Information may have been compromised in Defendants' Data Breach, including all individuals who received a notice letter about the Data Breach from Defendants.

177. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local

governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

178. Plaintiff reserves the right to amend the above definition or to propose subclasses in subsequent pleadings and motions for class certification.

179. **Numerosity, Fed. R. Civ. P. 23(a)(1):** The proposed Class is believed to be so numerous that joinder of all members is impracticable. According to the breach report submitted to the U.S. Department of Health and Human Services Office for Civil Rights, approximately 88,609 individuals were impacted in the Data Breach.[71] The Class is apparently identifiable within Defendants' records, and Defendants have already identified these individuals (as evidenced by sending them breach notification letters).

180. **Commonality**, Fed. R. Civ. P. 23(a)(2) and (b)(3): There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a. Whether Defendants engaged in the wrongful conduct alleged herein;

b. Whether Defendants failed to adequately safeguard Plaintiff's and the Class's Private Information;

c. Whether Defendants' computer systems and data security practices used to protect Plaintiff's and Class Members' Private Information violated the FTC Act, HIPAA, and/or state laws discussed herein;

d. Whether Defendants owed a duty to Plaintiff and the Class to adequately protect their Private Information, and whether they breached this duty;

---

[71] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf.

e. Whether Defendants knew or should have known that their shared network security systems were vulnerable to a data breach;

f. Whether Defendants' conduct, including their failure to act, resulted in or was the proximate cause of the Data Breach;

g. Whether Defendants breached contractual duties owed to Plaintiff and the Class to use reasonable care in protecting their Private Information;

h. Whether Defendants failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damage to Plaintiff and the Class;

i. Whether Defendants continue to breach duties to Plaintiff and the Class;

j. Whether Plaintiff and the Class suffered injuries as a proximate result of Defendants' actions or failures to act;

k. Whether Plaintiff and the Class are entitled to recover damages, equitable relief, and other relief;

l. Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiff and members of the Class and the general public;

m. Whether Defendants' actions alleged herein constitute recklessness and a breach of Defendants' obligations; and

n. Whether Plaintiff and Class Members are entitled to punitive damages.

181. **Typicality, Fed. R. Civ. P. 23(a)(3):** Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class were injured through Defendants' uniform misconduct. The same event and conduct that gave rise to Plaintiff's claims are identical to those that give rise to the claims of every other Class Member because Plaintiff and each member of

the Class had their sensitive Private Information compromised in the same way by the same conduct of Defendants.

182. **Adequacy, Fed. R. Civ. P. 23(a)(4):** Plaintiff are adequate representatives of the Class because their interests do not conflict with the interests of the Class they seek to represent; Plaintiff have retained counsel competent and highly experienced in data breach class action litigation; and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and their counsel.

183. **Superiority, Fed. R. Civ. P. 23(b)(3):** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult, if not impossible, for members of the Class individually to effectively redress Defendants' wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

184. The amount in controversy giving rise to jurisdiction under the Class Action Fairness Act (CAFA) exceeds $5 million, as the members of the class are expected to number in the tens if not hundreds of thousands, as there are approximately 32,000 in South Carolina alone, and Plaintiff seek damages for Defendants' failure to protect their confidential Private

Information, including medical records that command prices from $250 to $1,000 each on the dark web.[72]

185. Class certification is proper, because Defendants have acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

186. Class certification is proper, because Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all of the Plaintiff's and Class Members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

187. Finally, all Members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice letters by Defendants.

## VI. CAUSES OF ACTION

### COUNT ONE
### NEGLIGENCE AND NEGLIGENCE *PER SE*
### (On behalf of Plaintiff and the Class against Defendants)

188. Plaintiff re-allege and incorporate by reference paragraphs 1 through 187 above as if fully set forth herein.

189. Defendants together gathered and stored the Private Information of Plaintiff and Class Members as part of their joint healthcare business.

---

[72] Paul Nadrag, Capsule Technologies, *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web*, Fierce Healthcare (January 26, 2021), available at: https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web.

190. Plaintiff and Class Members entrusted Defendants with their Private Information with the reasonable understanding that Defendants would safeguard it through adequate and sufficient security measures.

191. Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

192. By assuming the joint responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a corresponding duty of care, jointly and severally, to use reasonable means to secure and safeguard Class Members' Private Information, to prevent disclosure of the information, and to safeguard the information from theft. Defendants' joint and several duties included the responsibility to implement processes by which they could detect a breach of their shared security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

193. Defendants had a shared duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

194. Defendants' shared duty to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

195. For instance, HIPAA requires Defendants to notify victims of the Data Breach within 60 days of discovering it. Yet, Defendants did not begin to notify Plaintiff or Class

Members of the Data Breach until almost a year after learning that unauthorized criminals accessed and acquired their confidential Private Information.

196. Defendants violated Section 5 of the FTC Act and HIPAA by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored on their shared systems and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class if those systems were breached.

197. Defendants acknowledged their duties under HIPAA, the FTC Act, and applicable State law within their own Privacy Notice, and made numerous representations to Plaintiff and the Class that their Private Information would be protected.

198. Plaintiff and the Class are within the class of persons that the FTC Act and HIPAA were intended to protect.

199. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act and HIPAA were intended to guard against.

200. Defendants' violation of Section 5 of the FTC Act and HIPAA constitutes negligence per se.

201. Defendants' shared duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

202. Defendants, separately and together, owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their shared systems and networks, and the personnel responsible for them, adequately protected the Private Information.

203. Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and their shared patients, including Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Defendants with their confidential Private Information, a necessary part of being patients at AAGA and MCDH.

204. Defendants were each and together subject to an "independent duty," untethered to any contract between Defendants and Plaintiff or the Class.

205. Defendants also had a shared duty to exercise appropriate clearinghouse practices to remove former patients' Private Information they no longer required to retain pursuant to applicable regulations.

206. Moreover, Defendants had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

207. Defendants had and continue to have a duty to adequately disclose that the Private Information of Plaintiff and the Class within Defendants' joint possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was and is necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

208. Defendants breached their duties, pursuant to the FTC Act, HIPAA, and other applicable standards, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of their shared networks and systems;

c. Failure to periodically ensure that their shared system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to detect in a timely manner that Class Members' Private Information had been compromised;

f. Failing to remove former patients' Private Information they no longer required to retain pursuant to applicable regulations,

g. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

209. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

210. It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the Data Breach was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

211. Defendants both had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

212. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants both knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendants' systems.

213. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

214. Plaintiff and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendants' possession.

215. Defendants were in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

216. Defendants' duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard Private Information.

217. Defendants admitted the Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

218. But for Defendants' joint wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

219. There is a close causal connection between Defendants' failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendants' joint failures to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

220. As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to (a) invasion of privacy; (b) theft

of their Private Information; (c) lost or diminished value of Private Information; (d) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (e) loss of benefit of the bargain; (f) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (g) experiencing an increase in spam calls, texts, and/or emails; (h) anxiety, emotional distress, and other non-economic losses; (i) Plaintiff's Private Information being disseminated on the dark web; (j) nominal damages; and (k) the continued and certainly increased risk to their Private Information, which: (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect it.

221. Defendants are therefore liable, jointly and severally, for Plaintiff's and Class Members' injuries resulting from Defendants' negligence.

222. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

223. Defendants' negligent conduct is ongoing, in that they still jointly hold the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

224. Plaintiff and Class Members are therefore entitled to damages, including restitution and unjust enrichment, declaratory and injunctive relief, and attorney fees, costs, and expenses.

**COUNT TWO**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiff and the Class against Defendants AACA and MCDH)**

225. Plaintiff re-allege and incorporate by reference paragraphs 1 through 187 above as if fully set forth herein.

226. Defendants AACA and MCDH (for purposes of this count, "Defendants") required Plaintiff and Class Members to provide their Private Information to Defendants as a condition of receiving medical care and treatment from Defendants at AAGA and MCDH clinic locations.

227. When Plaintiff and Class Members provided their Private Information to Defendants, they entered into implied contracts in which Defendants jointly agreed to comply with their statutory and common law duties to protect Plaintiff's and Class Members' Private Information and to timely notify Plaintiff and Class Members in the event of a Data Breach compromising that data.

228. Based on Defendants' representations (made on behalf of AAGA and MCDH jointly), legal obligations, and acceptance of Plaintiff's and the Class Members' Private Information, Defendants had a shared contractual duty to safeguard Plaintiff's and Class Members' Private Information through the use of reasonable industry standards.

229. The mutual understanding, between Plaintiff and Class Members on one hand, and Defendants on the other, that Defendants were obligated to safeguard patient Private Information from unauthorized access and disclosure, was reinforced by Defendants' representations in their shared Privacy Notice, set forth *supra*.

230. Defendants' Privacy Notices warranted to Plaintiff and Class Members that their Private Information would not be shared other than for purposes of providing medical treatment and related services. Defendants' Privacy Notice also acknowledges their duties under HIPPA and that patients have the right to prompt notification in the event of a breach.

231. Defendants' Privacy Notice also assured Plaintiff and Class Members that Defendants are jointly committed to protecting the privacy of the Private Information they collect; that Defendants must protect PHI under HIPAA and state law; that information Defendants collect and share as part of their joint business will be encrypted; and that the Private Information Defendants collected and maintained would be access guarded against unauthorized access.

232. Defendants failed to live up to their own stated policy and promises with regards to data privacy and data security, as cybercriminals were able to infiltrate their shared system and steal the Private Information belonging to Plaintiff and Class Members stored therein.

233. Defendants' Privacy Notice contains multiple assurances, applicable to both Defendants, that Defendants will comply with federal and state law.

234. Based on Defendants' foregoing assurances and representations, it was reasonable for Plaintiff and Class Members to expect their data would be guarded when maintained on Defendants' shared system.

235. Defendants breached their implied contracts with Plaintiff and Class Members by failing to safeguard Plaintiff's and Class Members' Private Information and failing to provide them with timely and accurate notice of the Data Breach. Indeed, it took Defendants over a year to warn Plaintiff and Class Member of their imminent risk of identity theft.

236. As a direct and proximate result of Defendants' breach of implied contract, for which Defendants are jointly and severally liable, Plaintiff and the Class Members have suffered damages as set forth herein, including foreseeable consequential damages that Defendants knew about when they required Plaintiff and the Class Members provide their Private Information while violating their express and implied promises to protect it.

## COUNT THREE
## BREACH OF FIDUCIARY DUTY
## (On behalf of Plaintiff and the Class against Defendants AAGA and MCDH)

237. Plaintiff re-allege and incorporate by reference paragraphs 1 through 187 above as if fully set forth herein.

238. At all relevant times, Defendants, as Plaintiff's and Class Members' healthcare provider, stood in a position of trust and confidence vis-à-vis Plaintiff and the Class.

239. At all relevant times, Defendants, as Plaintiff's and Class Members' healthcare provider and sophisticated business entities, had the ability to protect Plaintiff's and Class

Members' Private Information in Defendants shared control, and the unique knowledge regarding Defendants' joint cybersecurity practices, whereas Plaintiff and Class Members lacked such abilities and knowledge.

240. Accordingly, at all relevant times hereto, Defendants, as Plaintiff's and Class Members' healthcare provider, jointly owed fiduciary duties to Plaintiff and the Class, including the duty to keep Plaintiff and Class Members' Private Information reasonably secure.

241. The fiduciary duty Defendants owed to patients is explicated under the procedures set forth in the HIPAA Privacy Rule, including, without limitation the procedures and definitions of 45 C.F.R. §160.103 and 45 C.F.R. §164.530, which required Defendants to apply appropriate administrative, technical, and physical safeguards to protect the privacy of patient information and to secure the health care information it maintains and to keep it free from disclosure.

242. Defendants breached their joint fiduciary duties to Plaintiff and Class Members by failing to implement sufficient safeguards for their Private Information, and by disclosing Plaintiff's and Class Members' Private Information to unauthorized third parties in the Data Breach.

243. As a direct result of Defendants' breach of their fiduciary duty of confidentiality and their unauthorized disclosure of Plaintiff's confidential Private Information, Plaintiff and the Class Members have suffered damages as set forth herein.

244. Plaintiff and the other Class Members suffered and will continue to suffer damages including, but not limited to (a) the untimely and/or inadequate notification of the Breach; (b) improper disclosure of the Private Information; (c) loss of privacy; (d) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Breach; (e) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (f) the increased risk of identity theft; (g)

loss of the benefit of the bargain; and (h) emotional distress, embarrassment and humiliation, for which Defendants are jointly and severally liable.

**<u>COUNT FOUR</u>**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class against Defendants)**

245. Plaintiff re-allege and incorporate by reference paragraphs 1 through 187 above as if fully set forth herein.

246. Plaintiff and Class Members have an interest, both equitable and legal, in their Private Information that Defendants jointly collected, stored, and maintained, and which was ultimately compromised in the Data Breach.

247. As a required condition of Plaintiff and Class Members' receipt of Defendants' healthcare services, Plaintiff and Class Members entrusted their Private Information to Defendants.

248. In collecting and maintaining Plaintiff's and Class Members' Private Information Defendants received monetary benefits, including their use of the valuable Private Information for Defendants' shared business purposes and financial gain.

249. Plaintiff and Class Members further conferred a monetary benefit upon Defendants in the form of monies paid for healthcare services, which payments, upon information and belief, each Defendant ultimately received at least in part. A portion of Plaintiff's monies provided to Defendants was reasonably paid for the storage and maintenance of Plaintiff's and Class Members' Private Information in Defendants' shared network systems. Defendants' business model would not exist save for the need to ensure the security of Plaintiff's and Class Members' Private Information.

250. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information.

251. Defendants collected, maintained, and stored the Private Information of Plaintiff and Class Members and, as such, Defendants had direct knowledge of the monetary benefits conferred upon them.

252. Defendants, by way of their affirmative actions and omissions, knowingly and deliberately enriched themselves by saving the costs they reasonably and contractually should have expended on reasonable data privacy and security measures to secure Plaintiff's and Class Members' Private Information in Defendants' shared custody and control.

253. Instead of providing a reasonable level of security, training, and protocols that would have prevented the Data Breach, as described above and as is common industry practice among companies entrusted with similar Private Information, Defendants, instead consciously and opportunistically calculated to increase their own profits at the expense of Plaintiff and Class Members.

254. Defendants failed to adequately implement data security practices, procedures, and programs to secure sensitive Private Information, including without limitation those industry standard data security practices, procedures, and programs discussed herein.

255. As a direct and proximate result of Defendants' decision to profit rather than provide adequate data security, Plaintiff and Class Members suffered and continue to suffer actual damages, including (a) the amount of the savings and costs each Defendants reasonably and contractually should have expended on data security measures to secure Plaintiff's Private Information, and (b) the value Defendants gained from using Plaintiff's Private Information for profit while failing to protect it.

256. Defendants, upon information and belief, have therefore engaged in opportunistic and unethical conduct by profiting from conduct that they knew would create a significant and highly likely risk of substantial and certainly impending harm to Plaintiff and the Class in direct violation of Plaintiff's and Class Members' interests. As such, it would be inequitable,

unconscionable, and unlawful to permit Defendants to retain the benefits they derived as a consequence of their wrongful conduct.

257. Accordingly, Plaintiff and the Class are entitled to relief in the form of restitution and disgorgement of all ill-gotten gains, which should be put into a common fund to be distributed to Plaintiff and the Class.

**COUNT FIVE**
**DECLARATORY/INJUNCTIVE RELIEF**
**(On behalf of Plaintiff and the Class against Defendants)**

258. Plaintiff re-allege and incorporate by reference paragraphs 1 through 187 above as if fully set forth herein.

259. As previously alleged, Plaintiff and members of the Class entered into implied contracts with AAGA and MCDH which required Defendants to provide adequate security for the Private Information they collected from Plaintiff and the Class.

260. Defendants jointly owed a duty of care to Plaintiff and the members of the Class that requires Defendants to adequately secure Private Information.

261. Defendants still possess Private Information regarding Plaintiff and Class Members.

262. Defendants have not satisfied their contractual obligations and legal duties to Plaintiff and the Class. In fact, now that Defendants' insufficient data security is known to hackers, the Private Information in Defendants' possession is even more vulnerable to cyberattack.

263. Actual harm has arisen in the wake of the Data Breach regarding Defendants' contractual obligations and duties of care to provide security measures to Plaintiff and the

members of the Class. Further, Plaintiff and the members of the Class are at risk of additional or further harm due to the exposure of their Private Information and Defendants' joint failure to address the security failings that lead to such exposure.

264. There is no reason to believe that Defendants' security measures are any more adequate now than they were before the breach to meet Defendants' contractual obligations and legal duties.

265. Plaintiff, therefore, seeks a declaration that Defendants' existing security measures do not comply with their contractual obligations and duties of care to provide adequate security and that to comply with their contractual obligations and duties of care, Defendants must implement and maintain additional security measures, including, but not limited to:

a. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;
b. Engaging third-party security auditors and internal personnel to run automated security monitoring;
c. Auditing, testing, and training their security personnel regarding any new or modified procedures;
d. Segmenting their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;
e. Conducting regular database scanning and security checks;

f. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g. Purchasing credit monitoring services for Plaintiff and Class Members for a period of ten years; and

h. Meaningfully educating Plaintiff and Class Members about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendants, jointly and severally, as follows:

a. An order certifying this action as a class action, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff are proper representatives of the Class requested herein;

b. A judgment in favor of Plaintiff and the Class awarding them appropriate monetary relief, including actual damages, restitution, attorney fees, expenses, costs, and such other and further relief as is just and proper.

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class and the general public as requested herein, including, but not limited to:

i. Ordering that Defendants engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering

Defendants to promptly correct any problems or issues detected by such third-party security auditors;

ii. Ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

iii. Ordering that Defendants audit, test, and train their security personnel regarding any new or modified procedures;

iv. Ordering that Defendants segment customer data by, among other things, creating firewalls and access controls so that if one area of Defendants' systems is compromised, hackers cannot gain access to other portions of Defendants' systems;

v. Ordering that Defendants cease transmitting Private Information via unencrypted email;

vi. Ordering that Defendants cease storing Private Information in email accounts;

vii. Ordering that Defendants purge, delete, and destroy in a reasonably secure manner customer data that is not necessary for their provisions of services;

viii. Ordering that Defendants conduct regular database scanning and securing checks;

ix. Ordering that Defendants routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

x. Ordering Defendants to meaningfully educate their current, former, and prospective employees and subcontractors about the threats

faced as a result of the loss of financial and Private Information to third parties, as well as the steps they must take to protect against such occurrences;

d. An order requiring Defendants to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

e. A judgment in favor of Plaintiff and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses pursuant to O.C.G.A. Section 13-6-11, and as otherwise allowed by law; and

f. An award of such other and further relief as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

DATED: July 3, 2025

Respectfully submitted,

**STRANCH, JENNINGS & GARVEY, PLLC**

/s/ *J. Gerard Stranch, IV*
J. Gerard Stranch, IV (BPR 23045)
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801
gstranch@stranchlaw.com

Jeff Ostrow (*pro hac vice* forthcoming)
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 332-4200
ostrow@kolawyers.com

*Counsel for Plaintiff and the Proposed Class*