**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JUDITH NELSON, individually and on behalf of all others similarly situated,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 3:25-cv-00751** |
| **COVENANT SURGICAL PARTNERS, INC., ANNE ARUNDEL GASTROENTEROLOGY ASSOCIATES, P.A., and THE MARYLAND CENTER FOR DIGESTIVE HEALTH, LLC,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

Every day, patients routinely provide personally identifiable information ("PII") and protected health information ("PHI") to healthcare providers to receive medical treatment. On February 22, 2025, cybercriminals breached the computer network that Covenant Surgical Partners, Inc. ("CSP") maintained with Anne Arundel Gastroenterology Associates, P.A. ("AAGA") and The Maryland Center for Digestive Health, LLC ("MCDH") and stole patients' PII and PHI. CSP later notified potentially affected patients of the breach and theft of their information. Judith Nelson received that notice. She now brings this putative class action against CSP, AAGA, and MCDH. She makes claims for negligence and negligence per se against all Defendants, breach of implied contract and fiduciary duty against AAGA and MCDH, and unjust enrichment against all Defendants. She seeks damages as well as declaratory and injunctive relief. Defendants move to dismiss the Complaint and strike the class allegations. The motion is ripe for

review. (Doc. Nos. 20, 21, 27, 29). For the reasons below, the motion will be granted in part and denied in part.

## I. Factual Allegations[1]

### A. Defendants' Control Over Patient Information

CSP "furnishes support services to healthcare providers." (Doc. No. 1 ¶ 29). AAGA is "a gastroenterology practice and top surgical center in the country," while MCDH is an "AAGA-affiliated practice providing GI care across MCDH and AAGA clinics." (Id. ¶ 28). Nelson and putative class members "went to MCDH and AAGA clinics for healthcare services." (Id. ¶ 29).

"As part of their joint business, including to furnish medical treatment to patients, Defendants[2] obtain and store patients' Private Information, including that of" Nelson and putative class members. (Id. ¶ 30). The "Private Information Defendants collected from patients at MCDH and AAGA locations is maintained and shared on a server managed and accessible by Defendants." (Id. ¶ 31). "As a condition of receiving medical services at MCDH and AAGA locations," Nelson and putative class members "were required to provide Defendants with their highly sensitive Private Information, including some of their most private and confidential PII and PHI." (Id. ¶ 35). Nelson "entrusted her Private Information to Defendants as a condition and in exchange for receiving healthcare services at MCDH, with the reasonable expectation and mutual understanding that Defendants would keep such information confidential and secure from unauthorized access." (Id. ¶ 82).

---

[1] The Court draws the facts from the Complaint (Doc. No. 1) and assumes their truth to rule on the motion to dismiss. Erickson v. Pardus, 551 U.S. 89, 94 (2007).

[2] The Complaint defines the term "Defendants" to refer collectively to CSP, AAGA, and MCDH. (Doc. No. 1 at 1).

By taking "possession and control" of that information, "Defendants assumed a duty to ensure the Private Information was securely stored and protected through adequate, legally compliant, and industry standard data security measures." (Id. ¶ 8). "Defendants had and continue to have a duty to exercise reasonable care in collecting, storing, and protecting the Private Information from the foreseeable risk of a data breach" because of "the special relationship that exists between Defendants" and Nelson and the putative class members. (Id. ¶ 127).

HIPAA and the FTC Act, as well as accepted industry cybersecurity standards, are sources of the data-security practices and procedures applicable to Defendants. (Id. ¶¶ 102–32, 193–202). Nelson and the putative class members "had no ability to protect their Private Information that was in, and possibly remains in, Defendants' possession." (Id. ¶ 214). Defendants, on the other hand, "had the ability to protect" Nelson and the putative class members' "Private Information in Defendants [sic] shared control, and the unique knowledge regarding Defendants' joint cybersecurity practices." (Id. ¶ 239).

B. Defendants' Protection of the Information

Defendants did not adequately protect that information. They "failed to spend sufficient resources on preventing external access, detecting outside infiltration, and training their employees on appropriate data security practices." (Id. ¶ 52). Their network lacked "sufficient multi-layer data security technologies," "effective firewalls," "effective endpoint detection," and the patient information stored on the network "was not encrypted." (Id. ¶¶ 52–54). Defendants also maintained patient information "outside of their electronic health record system, in violation of statutory, regulatory, and common law duties and obligations." (Id. ¶ 55).

C. The Data Breach and Notice

On February 22, 2025, "CSP discovered that certain systems within its network had been subjected to unauthorized activity." (Id. ¶ 44). After an investigation, Defendants determined that

"cybercriminals infiltrated" their systems and "accessed and removed data," which contained Nelson and the putative class members' "unencrypted Private Information." (Id.) On May 28, 2025, Nelson "received a notice letter from Defendants" regarding the breach. (Id. ¶ 83). The "Notice of Data Breach,"[3] which CSP addressed directly to Nelson, stated that CSP was providing information about "a recent cybersecurity incident that may have affected your personal information." (Doc. No. 21-1 at 2). CSP explained that it worked with AAGA and MCDH, "where you may have received services or paid for someone else's services." (Id.)

The notice then described what CSP had learned about the breach. CSP stated that on February 22, 2025, it discovered that "certain systems within its network may have been subject to unauthorized activity" and, on February 25, determined that "an unauthorized third party was able to access and remove data from its network on February 22, 2025." (Id.) CSP "completed" its "review" of the affected data "on April 23, 2025," "notified" Nelson's provider or providers "on April 25, 2025," and completed efforts "to locate and verify addresses for potentially affected individuals" "on May 9, 2025." (Id.) The notice further stated: "To date, we are not aware of any misuse of your data." (Id.)

The notice then identified the specific information that may have been involved:

> The personal information involved may have included one or more of the following elements:
>
>> (1) information to identify and contact you (such as name, date of birth, address, and email address);

---

[3] Nelson attached only the first page of the May 28, 2025 notice to the Complaint. (Doc. No. 1-1). Defendants attached the complete five-page notice to their motion to dismiss. (Doc. No. 21-1). The Court may consider the complete notice because the Complaint expressly refers to and relies on it, and the notice is central to Nelson's claims. See Bassett v. Nat'l Collegiate Athletic Ass'n, 528 F.3d 426, 430 (6th Cir. 2008).

> (2) health insurance information (insurer name, subscriber name, policy information including type and policy number, Medicaid or Medicare numbers, and billing and claims information); and/or
>
> (3) patient medical information (medical record number, patient account number, provider name, diagnosis information, imaging or test results, and treatment and prescription information). Not all data elements were involved for each individual.

(Id.) The notice expressly informed Nelson: "Your Social Security number, driver's license or state ID number, financial account information, and account passwords were not involved in this incident." (Id.)

The notice then described CSP's response to the breach: "As soon as we discovered the incident, we immediately took action to mitigate and remediate the incident and to help prevent further unauthorized activity. We continue to enhance our security controls and monitoring practices as appropriate to minimize the risk of any similar incident in the future." (Id. at 3).

Finally, the notice instructed Nelson to take several steps to protect her information. CSP "encourage[d]" Nelson "to carefully review statements sent from healthcare providers and insurance companies to ensure that all account activity is valid" and instructed that "[a]ny questionable charges should be promptly reported to the provider or company with which the account is maintained." (Id.) Similarly, the "Reference Guide" accompanying the notice instructed Nelson to "[c]arefully review statements sent to you from your healthcare providers, insurance company, and financial institutions to ensure that all of your account activity is valid" and to "[r]eport any questionable charges promptly." (Id. at 4). It further instructed Nelson to order her free credit report, explained how to contact the Federal Trade Commission if she detected unauthorized transactions or identity theft, advised her to place a fraud alert on her credit file, and informed her of her right to request a credit freeze. (Id. at 4–5).

D. Nelson's Harm

"Because of the Data Breach, Plaintiff Nelson's Private Information is now in the hands of cybercriminals intent on misusing it." (Doc. No. 1 ¶ 85). Nelson's "Private Information was accessed and obtained by a third party without her consent or authorization," and she is "imminently at risk of crippling future identity theft and fraud for her lifetime." (Id. ¶¶ 86–87). Nelson "has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach." (Id. ¶ 88). She has "expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach and reviewing account statements and other information." (Id.) That time "was lost and unproductive and took away from other activities and money-making opportunities." (Id.) Nelson "anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach." (Id. ¶ 89). Nelson has also experienced an "increase in spam calls, texts, and/or emails," which she attributes "to the Data Breach given the time proximity." (Id. ¶¶ 91–92). Nelson has suffered "stress, anxiety, and concern due to the loss of her privacy and concern over the impact of cybercriminals accessing and further misusing her Private Information," and "fears that criminals will use her information to commit identity theft." (Id. ¶ 93).

## II. Legal Standard

A. Fed. R. Civ. P. 12(b)(1)

"Rule 12(b)(1) motions to dismiss . . . generally come in two varieties: a facial attack or a factual attack." Gentek Bldg. Prods., Inc. v. Sherwin–Williams Co., 491 F.3d 320, 330 (6th Cir. 2007). A facial attack challenges the sufficiency of the complaint's allegations, while a factual attack challenges the factual existence of subject matter jurisdiction. Id. When considering a

factual attack, the court does not presume the complaint's allegations to be true and may weigh evidence outside the pleadings or conduct a limited evidentiary hearing to resolve disputed jurisdictional facts. Id. When a Rule 12(b)(1) motion challenges subject matter jurisdiction based on the face of the complaint, as this one does, the court "takes the allegations in the complaint as true" and evaluates jurisdiction accordingly. Id. The complaint must contain allegations sufficient to establish subject matter jurisdiction. See id.

B. Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Venema v. West, 133 F.4th 625, 632 (6th Cir. 2025) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 556 U.S. at 678). When determining whether the complaint meets this standard, the Court must accept the factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and "take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief." Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018).

C. Fed. R. Civ. P. 12(f)

"Rule 12(f) allows a court to strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Operating Eng'rs Loc. 324 Health Care Plan v. G & W Const. Co., 783 F.3d 1045, 1050 (6th Cir. 2015). "Motions to strike are viewed with disfavor and are not frequently granted." Id. "[W]here the complaint itself demonstrates that a class action cannot be maintained, even with discovery or more time, a court may strike class allegations before a motion for class certification." Cunningham v. Vanderbilt Univ., 2020 WL 13443878, at *1 (M.D. Tenn. Jan. 10, 2020).

## III. Analysis

Nelson asserts claims for negligence and negligence per se, breach of implied contract, breach of fiduciary duty, and unjust enrichment. (Doc. No. 1 ¶¶ 188–257). She also requests declaratory and injunctive relief. (Id. ¶¶ 258–65). Defendants argue that Nelson lacks Article III standing, that Tennessee's Cybersecurity Safe Harbor, Tenn. Code Ann. § 29-34-215, bars her class allegations, and that she has failed to state any of her claims. (Doc. No. 21 at 4–22).

The Court first addresses standing and concludes that Nelson has adequately alleged standing to pursue her substantive claims. It then addresses Defendants' challenge to Nelson's requests for declaratory and injunctive relief and construes those requests as remedies rather than an independent cause of action. The Court next considers whether the Cybersecurity Safe Harbor bars Nelson's class allegations. Finally, the Court addresses the sufficiency of Nelson's negligence, implied-contract, fiduciary-duty, and unjust-enrichment claims.

### A. Standing

Defendants challenge Nelson's standing on five grounds. Defendants argue that Nelson has not alleged an injury fairly traceable to AAGA because she does not allege that AAGA possessed her private information or that she had any interaction with AAGA. (Doc. No. 21 at 5). They also argue that Nelson's alleged increase in spam calls, texts, or emails is not traceable to the breach. (Id. at 5–6). They then argue that Nelson does not allege any actual diminution in the value of her private information because she did not allege that she tried to sell her information but was unable to or that she sold it for a lower price. (Id. at 6). They next argue that her alleged loss of privacy is insufficient because the breach notice states only that her information "may have" been affected. (Id. at 6–7). Finally, they argue that Nelson's alleged risk of future identity theft is too speculative to constitute an injury, and therefore her mitigation efforts and emotional harm cannot establish standing. (Id. at 7–8).

"Federal courts," the Supreme Court has often explained, "are courts of limited jurisdiction." See, e.g., Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). Consistent with that limited jurisdiction, federal courts "do not possess a roving commission to publicly opine on every legal question." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). The text of the Constitution instead limits a federal court's jurisdiction to only the kinds of "Cases" and "Controversies" listed in Article III. U.S. Const. art. III, § 2, cl. 1. For Nelson's "lawsuit to constitute a case within the meaning of Article III," she "must have standing to sue." Diamond Alt. Energy, LLC v. EPA, 606 U.S. 100, 110 (2025). Nelson must satisfy three elements: "injury in fact, causation, and redressability." Id. at 111 (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). To establish an injury in fact, Nelson must allege an injury that is "concrete," "particularized," and "actual or imminent, not speculative." FDA v. All. for Hippocratic Med., 602 U.S. 367, 381 (2024).

The Sixth Circuit's application of the injury-in-fact requirement in a data breach case in Galaria v. Nationwide Mut. Ins. Co., 663 F. App'x 384 (6th Cir. 2016) is instructive. In that case, hackers stole the plaintiffs' personal information—including names, dates of birth, and social security numbers—from the defendant's computer network, and the plaintiffs alleged an increased risk of identity theft and costs incurred to monitor their credit and financial accounts. Id. at 386–87. On those alleged facts, the Sixth Circuit held that "a substantial risk of harm, coupled with reasonably incurred mitigation costs," established an injury in fact at the pleading stage. Id. at 388. Once the data was "in the hands of ill-intentioned criminals," the plaintiffs did not have to "wait for actual misuse" before "taking steps to ensure their own personal and financial security." Id. at 388–89. Those reasonably incurred mitigation costs constituted a "concrete injury." Id.

The Supreme Court later applied the injury-in-fact requirement in a case involving false credit reporting information in TransUnion LLC v. Ramirez, 594 U.S. 413 (2021). In that case, the Court distinguished between class members whose misleading credit reports were disseminated to third-party businesses and those whose reports remained in TransUnion's internal files. Id. at 432–35. The Court held that the first group suffered a concrete injury because dissemination of the misleading information bore a "close relationship" to the reputational harm traditionally associated with defamation. Id. at 432–33. According to the Court, however, the second group did not suffer a comparable injury because their reports had not been disseminated. Id. at 433–35. Those class members alternatively argued that the misleading information in their files created a material risk of future dissemination. Id. at 435. The Court held that "the mere risk of future harm, standing alone," does not constitute concrete harm "unless the exposure to the risk of future harm itself causes a separate concrete harm." Id. at 436.

The district court in Cooper v. Nationwide Recovery Serv., Inc., 2026 WL 1876165 (E.D. Tenn. Apr. 21, 2026) recently applied Galaria and TransUnion in a data breach case similar to the one before the Court. The Court finds Cooper persuasive. In that case, the district court found that the plaintiffs plausibly alleged injury in fact where they alleged that their "PII and PHI [had] been disseminated to third-party cybercriminals because of the data breach" and that they faced reasonably imminent mitigation costs from the resulting risk of identity theft or fraud. Id. at *4. The alleged dissemination, according to the district court, made the plaintiffs "more like the certified class in TransUnion" whose information had actually been disclosed, while their alleged mitigation costs were sufficient harms under Galaria. Id. Applying those principles together, the district court concluded that the plaintiffs had plausibly alleged "an injury-in-fact sufficient to

confer Article III standing" from the dissemination of their information and the resulting mitigation costs. Id.

The same reasoning applies here. Nelson plausibly alleges a concrete injury based on both the dissemination of her private information and the mitigation costs resulting from that dissemination. First, Nelson plausibly alleges that her private information was actually disseminated. She alleges that, "[b]ecause of the Data Breach, Plaintiff Nelson's Private Information is now in the hands of cybercriminals intent on misusing it," that her "Private Information was accessed and obtained by a third party without her consent or authorization," and that she is "imminently at risk of crippling future identity theft and fraud for her lifetime." (Doc. No. 1 ¶¶ 85–86). Taking those allegations as true, Nelson is like the plaintiffs in Cooper whose confidential information had already been disseminated to cybercriminals and, in that respect, the class whose false credit reporting information had been disseminated in TransUnion. See TransUnion, 594 U.S. at 432–35; Cooper, 2026 WL 1876165, at *4. The alleged dissemination of Nelson's private information thus constitutes a concrete injury.[4]

Second, Nelson plausibly alleges a concrete injury from the mitigation efforts caused by that dissemination. She alleges that she "has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach," including "researching facts about the Data Breach and reviewing account statements and other information." (Doc. No. 1 ¶ 88). She further alleges that this time "was lost and unproductive and took away from other activities and

[4] TransUnion did not hold that dissemination, standing alone, constitutes concrete harm. The information disseminated there was misleading, and the Court found a concrete injury because its publication bore a close relationship to the traditionally recognized harm of defamation. TransUnion, 594 U.S. at 432–33. This Court relies only on TransUnion's distinction between information that remained internal and information actually disseminated, as Cooper applied that distinction to the dissemination of confidential PII and PHI to cybercriminals in a data breach. See Cooper, 2026 WL 1876165, at 4.

money-making opportunities," and that she "anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach." (Id. ¶¶ 88–89). These allegations fall squarely within Galaria and satisfy Cooper with even greater force because Nelson alleges mitigation costs that she has already incurred in addition to costs that she reasonably expects to incur in the future. Because Nelson alleges that her information is already "in the hands of cybercriminals," she has plausibly suffered a concrete injury through her past and future mitigation efforts because there is a substantial risk that the cybercriminals will misuse that information. See Galaria, 663 F. App'x at 389 (holding that, "although it might not be 'literally certain' that Plaintiffs' data will be misused, there is a sufficiently substantial risk of harm that incurring mitigation costs is reasonable") (internal citation omitted).

Because those injuries are sufficient to establish Article III standing, the Court need not decide whether each of Nelson's other alleged injuries would independently suffice. Nelson also alleges an increase in spam calls, texts, and emails, diminution in the value of her private information, and emotional harm. (Doc. No. 1 ¶¶ 91–94). Defendants challenge each of those injuries. (Doc. No. 21 at 5–8). Those challenges do not alter the Court's conclusion that Nelson has adequately alleged concrete injury through the dissemination of her private information and her past and future mitigation costs.

Defendants' remaining arguments also do not change that conclusion. Defendants argue that Nelson cannot trace her injuries to AAGA because she alleges that she received treatment from MCDH and does not allege that AAGA possessed her information. (Doc. No. 21 at 5). Nelson, however, alleges that she and putative class members "went to MCDH and AAGA clinics for healthcare services," that all Defendants jointly "obtain[ed] and store[d]" Nelson and putative class members' private information, and that such information was "maintained and shared on a

server managed and accessible by Defendants." (Doc. No. 1 ¶¶ 29–31). Those allegations are sufficient to plausibly trace Nelson's injuries, in part, to AAGA.

Although Defendants argue that CSP's notice stated only that the incident "may have affected" Nelson's information (Doc. No. 21-1 at 2), the notice also states that an unauthorized third party "was able to access and remove data from [CSP's] network" (id.), and Nelson believes her information was among the data obtained. (Doc. No. 1 ¶¶ 85–86). Construing those allegations in Nelson's favor, as the Court must at this stage, it is plausible that her private information was disseminated. Nelson has alleged Article III standing to support her substantive claims for negligence, breach of implied contract, breach of fiduciary duty, and unjust enrichment.

Defendants also challenge Nelson's standing to seek prospective declaratory and injunctive relief. (Doc. No. 21 at 8–9). A plaintiff seeking prospective relief must allege a "real and immediate threat that the plaintiff will be wronged again." City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983). Without taking an early conclusive position, the Court finds it unlikely that Nelson has plausibly alleged such a threat based on the possibility of some other future data breach that has not occurred. But the Court does not construe Nelson's request for declaratory and injunctive relief as asserting an independent cause of action. Rather, those allegations request declaratory and injunctive remedies based on Nelson's substantive claims. (Doc. No. 1 ¶¶ 259–65). Because the Court is not awarding any prospective relief at this time, the Court declines to determine the scope of the prospective remedies that Nelson may or may not have standing to obtain. The Court will address that issue at the appropriate time.

B. Tennessee Cybersecurity Safe Harbor

Tennessee law provides that "[a] private entity is not liable in a class action lawsuit resulting from a cybersecurity event unless the cybersecurity event was caused by willful and wanton misconduct or gross negligence on the part of the private entity." Tenn. Code Ann. § 29-

34-215(b). A "cybersecurity event" is "an event resulting in unauthorized access to, or disruption or misuse of, an information system or nonpublic information stored on an information system." Id. § 29-34-215(a)(1). Defendants argue that this so-called "cybersecurity safe harbor" bars Nelson's class allegations because Nelson does not plausibly allege that willful and wanton misconduct or gross negligence caused the data breach. (Doc. No. 21 at 21–22).

Tennessee law controls what conduct qualifies as willful and wanton misconduct or gross negligence. Willful or wanton misconduct is "intentional wrongful conduct, done either with knowledge that serious injury to another will probably result, or with a wanton and reckless disregard of the possible results." In re Veronica T., 2018 WL 1410909, at *5 (Tenn. Ct. App. Mar. 21, 2018) (quoting 8 Tenn. Prac. Pattern Jury Instr. T.P.I.—Civil 3.30 (2017 ed.)). Gross negligence is a "negligent act done with utter unconcern for the safety of others, or one done with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law." Leatherwood v. Wadley, 121 S.W.3d 682, 694 (Tenn. Ct. App. 2003). "To prevail on a claim of gross negligence in Tennessee, a plaintiff must demonstrate ordinary negligence and must then prove that the defendant acted with utter unconcern for the safety of others, or with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law." Id. (cleaned up) (quoting Menuskin v. Williams, 145 F.3d 755, 766 (6th Cir. 1998)). Whether or not conduct "rises to the level of willful, wanton or gross negligence" is a fact-bound inquiry that "turns upon the facts of each case." KMI Grp., Inc. v. Wade Acres, LLC, 2019 WL 1504034, at *11 (Tenn. Ct. App. Apr. 5, 2019).

The Court is aware of only five nonbinding decisions that have considered the cybersecurity safe harbor, and most addressed whether it applies retroactively without deciding whether the allegations were sufficient to establish willful and wanton misconduct or gross

negligence.[5] Of those five, Cooper is the only decision where the district court decided whether allegations of gross negligence were sufficient to avoid the safe harbor at the pleading stage. The district court there found allegations that the defendant failed to implement reasonable cybersecurity safeguards and adequately train its employees, that hackers remained in the defendant's network for "nearly a week" before it detected them, and that the defendant waited almost a year after the breach to notify affected individuals "plausibly suggest[ed] that the underlying data breach could be the result of [the defendant's] gross negligence." Cooper, 2026 WL 1876165, at *5.

The Court finds Cooper persuasive, but it refines its analysis in one respect. The text of the cybersecurity safe harbor requires the willful and wanton misconduct or gross negligence to have "*caused*" the cybersecurity event. Tenn. Code Ann. § 29-34-215(b) (emphasis added). Conduct that occurs after the cybersecurity event—i.e., in Cooper, the amount of time it took the defendant to notify individuals of the breach—necessarily cannot satisfy that causal requirement. Accordingly, to the extent Cooper relied on those allegations in its safe harbor analysis, this Court declines to consider Nelson's allegations concerning the time that it took Defendants to notify affected individuals of the breach in assessing whether the cybersecurity safe harbor applies. Beyond that, Nelson's allegations are weaker than those in Cooper. She does not allege, for example, that cybercriminals remained undetected in Defendants' network for nearly a week, as in Cooper. Contra Cooper, 2026 WL 1876165, at *5.

[5] Haney v. Charter Foods N., LLC, 747 F. Supp. 3d 1093, 1108–09 (E.D. Tenn. 2024) (declining to reach the sufficiency of the allegations concerning willful and wanton misconduct or gross negligence after holding that the cybersecurity safe harbor did not apply retroactively); Cahill v. Mem'l Heart Inst., LLC, 2024 WL 4311648, at *5 (E.D. Tenn. Sept. 26, 2024) (same); Mason v. Wright Bros. Constr. Co., 2025 WL 939709, at *4–6 (E.D. Tenn. Mar. 27, 2025); Battles v. Affinity Cardiovascular Specialist, LLC, 2025 WL 4661921, at *3–4 (M.D. Tenn. Feb. 10, 2025) (declining to decide the statute's application when granting leave to amend).

Even so, Nelson alleges enough facts to plausibly show that the cybersecurity event was caused by willful and wanton misconduct or gross negligence. Nelson alleges that Defendants knew or should have known about the prevalence of cyberattacks in the healthcare industry and the particular importance of protecting the information they maintained. (Doc. No. 1 ¶¶ 76–77, 136–39). She further alleges that Defendants were "fully aware of their obligation to protect" their patients' private information and were "sophisticated and technologically savvy businesses that rely extensively on technology systems and networks" to store that information. (Id. ¶ 126). She also alleges that Defendants "alone had the exclusive ability to implement adequate security measures" to protect the information. (Id. ¶ 127). Despite that knowledge and control, Nelson alleges that Defendants, among other things:

- failed to comply with HIPAA security requirements by, among other things, "[f]ailing to maintain an adequate data security system to prevent data loss" (id. ¶¶ 109–11, 116);
- failed to employ "reasonable and appropriate measures to protect against unauthorized access to confidential consumer data" as required by the FTC Act (id. ¶¶ 119–25);
- "failed to properly implement basic data security practices" (id. ¶ 125);
- failed to follow industry practices that included, among other things, "encryption" and "multi-factor authentication" (id. ¶ 129); and
- failed to follow industry practices that included, among other things, "appropriate malware detection software," network "monitoring," "firewalls," and staff training regarding these points (id. ¶ 130).

Nelson also connects these alleged failures to the data breach, alleging that "[h]ad Defendants followed these standards and requirements, the Data Breach would have been prevented." (Id. ¶ 169).

Taken together, those allegations plausibly support an inference that Defendants, despite their knowledge of the risks, acted with "a wanton and reckless disregard of the possible results,"

In re Veronica T., 2018 WL 1410909, at *5, or "such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law." Leatherwood, 121 S.W.3d at 694. Together, this conduct caused the cybersecurity event. The cybersecurity safe harbor does not bar Nelson's class allegations, and the Court will not strike Nelson's class allegations.

C. Negligence and Negligence Per Se

Defendants argue that Nelson fails to state a negligence claim because she improperly groups Defendants together, does not plausibly allege a breach of any duty, and has not alleged compensable damages. (Doc. No. 21 at 10–15). To prevail on a negligence claim under Tennessee law, a plaintiff must establish "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause." Satterfield v. Breeding Insulation Co., 266 S.W.3d 347, 355 (Tenn. 2008) (citation omitted).

As discussed above in connection with the cybersecurity safe harbor, Nelson plausibly alleges that Defendants' willful and wanton misconduct or gross negligence caused the cybersecurity event. Because gross negligence requires a greater degree of culpability than ordinary negligence, Leatherwood, 121 S.W.3d at 694, Nelson plausibly alleges that Defendants breached a duty of care and that their breach caused the data breach. See Cooper, 2026 WL 1876165, at *6 (relying on allegations found sufficient under the cybersecurity safe harbor to plausibly allege gross negligence to conclude that the plaintiffs plausibly alleged ordinary negligence).

Defendants' remaining arguments do not change that conclusion. Their group-pleading argument (Doc. No. 21 at 10–11) overlooks Nelson's allegations that, "[a]s part of their joint business," Defendants "obtain and store patients' Private Information," and that this information "is maintained and shared on a server managed and accessible by Defendants." (Doc. No. 1 ¶¶

30–31). Nelson further alleges that Defendants "jointly collected and stored" the information (id. ¶ 32), and identifies failures concerning "their shared networks and systems" (id. ¶ 208). Those allegations plausibly connect each Defendant to the failure to safeguard Nelson's information.

Defendants' damages argument (Doc. No. 21 at 12–15) fares no better. They argue, among other things, that lost time spent responding to a data breach is not compensable under Tennessee negligence law. (Id. at 13–14). Yet Nelson alleges more than just lost time. She seeks reimbursement for "out-of-pocket costs" and "future costs of identity theft monitoring" (Doc. No. 1 ¶ 17), "anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach" (id. ¶ 89), and has "incurred and will incur actual damages in an attempt to prevent identity theft" (id. ¶ 154). Those mitigation costs are separate from lost time and sufficient to satisfy the damages element of Nelson's negligence claim. Because Nelson has plausibly alleged each element of negligence, the Court need not decide whether her other alleged injuries, including increased spam calls, diminution in the value of her Private Information, and lost time, are compensable.

Defendants' arguments concerning negligence per se, however, have merit. Defendants argue that negligence per se is not an independent cause of action under Tennessee law, so Nelson cannot allege violations of HIPAA and the FTC Act as separate causes of action. (Doc. No. 21 at 15–16). The Court agrees. Under Tennessee law, "[t]he negligence per se doctrine does not create a new cause of action." Rains v. Bend of the River, 124 S.W.3d 580, 589 (Tenn. Ct. App. 2003) (citation omitted). Instead, "it is a form of ordinary negligence that enables the courts to use a penal statute to define a reasonably prudent person's standard of care." Id.; see also Cooper, 2026 WL 1876165, at *6 (dismissing a separate negligence per se claim under Tennessee law as duplicative of the plaintiffs' ordinary negligence claim). Accordingly, to the extent Nelson asserts

a separate negligence per se claim based on Defendants' alleged violations of HIPAA or the FTC Act, that claim will be dismissed. Those violations, however, may still bear on whether Defendants breached the applicable standard of care as part of Nelson's ordinary negligence claim.

D. Breach of Implied Contract

Defendants argue that Nelson fails to state a breach-of-implied-contract claim against AAGA and MCDH because she does not plausibly allege mutual assent or consideration. (Doc. No. 21 at 16–18). They also argue that Nelson alleges receiving treatment only from MCDH and therefore alleges no basis for an implied contract with AAGA. (Id.)

"A contract implied in fact is one that arises under circumstances which show mutual intent or assent to contract." Thompson v. Hensley, 136 S.W.3d 925, 930 (Tenn. Ct. App. 2003) (cleaned up). In order to be enforceable, an implied-in-fact contract "must be supported by mutual assent, consideration, and lawful purpose." Id. Defendants challenge only the existence of an implied contract.

The district court's decision in Cahill v. Mem'l Heart Inst., LLC, 2024 WL 4311648 (E.D. Tenn. Sept. 26, 2024), is instructive on the circumstances in which an implied contract may form from a patient's exchange of PII with a medical provider. There, the defendant argued that the patients failed to allege mutual assent because they failed to identify specific actions taken by the defendant from which an agreement could be inferred. Id. at *11. The patients alleged that they "provided PII" to the provider "as part of the exchange for medical services" and that the provider's acceptance of the PII "created an implied contract to safeguard" it. Id. at *12. They further alleged that they "did not provide the PII gratuitously but rather expected that it would be protected and they would receive medical services in return." Id. They also alleged that the exchange benefited the provider because its receipt of their PII "increased [its] income from provision of medical

services." Id. The district court concluded that those allegations plausibly established an implied contract requiring the provider to safeguard the patients' PII. Id.

Haney v. Charter Foods North, LLC, 747 F. Supp. 3d 1093, 1112–13 (E.D. Tenn. 2024), and Mason v. Wright Bros. Construction Co., 2025 WL 939709, at *8–9 (E.D. Tenn. Mar. 27, 2025), reached the same conclusion in the employment context. In Haney, the district court explained that "several courts in this circuit have held that an implied contract is formed between an employer and employee when employees are required to provide personal information to their employer as a condition of their employment, and the resulting implied contract requires the employer to take reasonable steps to protect the employees' information." 747 F. Supp. 3d at 1113. In Mason, the district court likewise recognized that, "[i]n data-breach cases, a clear majority of courts, including several district courts within the Sixth Circuit," have held the same. 2025 WL 939709, at *9. Both courts concluded that allegations that the plaintiffs were required to provide their PII as a condition of employment plausibly established an implied agreement to reasonably protect that information. Haney, 747 F. Supp. 3d at 1113; Mason, 2025 WL 939709, at *9.

Nelson plausibly alleges the same here, so that an implied contract formed between her and AAGA and MCDH by virtue of her exchange of private information for medical services. Nelson alleges that she and the putative class members "were required to provide their Private Information to Defendants as a condition of receiving healthcare services." (Doc. No. 1 ¶ 6). More specifically, she alleges that AAGA and MCDH "required Plaintiff and Class Members to provide their Private Information to Defendants as a condition of receiving medical care and treatment from Defendants at AAGA and MCDH clinic locations." (Id. ¶ 226). She further alleges that, when she and the putative class members provided that information, AAGA and MCDH "jointly agreed to comply

with their statutory and common law duties to protect" it, and that their "acceptance of Plaintiff's and the Class Members' Private Information" gave rise to a "shared contractual duty to safeguard" it. (Id. ¶¶ 227–28). Like the patients in Cahill, Nelson alleges that AAGA and MCDH "received monetary benefits, including their use of the valuable Private Information for Defendants' shared business purposes and financial gain" by "collecting and maintaining Plaintiff's and Class Members' Private Information." (Id. ¶ 248). Nelson also alleges that she and the putative class members "conferred a monetary benefit upon Defendants in the form of monies paid for healthcare services," which "each Defendant ultimately received at least in part." (Id. ¶ 249). Those allegations plausibly establish an implied contract with AAGA and MCDH to reasonably protect Nelson's Private Information. See Cahill, 2024 WL 4311648, at *11–12; Haney, 747 F. Supp. 3d at 1112–13; Mason, 2025 WL 939709, at *8–9.

E. Breach of Fiduciary Duty

Defendants argue that Nelson's breach-of-fiduciary-duty claim against AAGA and MCDH fails because neither Defendant owed her a fiduciary duty. (Doc. No. 21 at 18–19). They contend that Tennessee law does not recognize healthcare companies that possess patient information as fiduciaries. (Id.)

To state a claim for breach of fiduciary duty under Tennessee law, a plaintiff must allege "(1) a fiduciary relationship; (2) breach of the resulting fiduciary duty; and (3) injury to the plaintiff or benefit to the defendant as a result of that breach." Cahill, 2024 WL 4311648, at *14 (citing Ann Taylor Realtors, Inc. v. Sporup, 2010 WL 4939967, at *3 (Tenn. Ct. App. Dec. 3, 2010)). Tennessee recognizes relationships that are fiduciary per se, including those between guardian and ward and attorney and client. Foster Bus. Park, LLC v. Winfree, 2009 WL 113242, at *12 (Tenn. Ct. App. Jan. 15, 2009). A fiduciary relationship may also arise when one party exercises "dominion and control over another." Id. Relationships that are not fiduciary per se therefore

"require proof of the elements of dominion and control in order to establish the existence of a confidential relationship," and "both parties must understand that a special trust or confidence has been reposed." Id.

It is well-settled that the physician-patient relationship is fiduciary in nature. Shadrick v. Coker, 963 S.W.2d 726, 736 (Tenn. 1998). This Court has also addressed whether that fiduciary relationship extends to the healthcare entity itself. In Welch v. United Network for Organ Sharing, 767 F. Supp. 3d 746 (M.D. Tenn. 2025), this Court addressed what was then "a matter of first impression both in Tennessee courts and in the Sixth Circuit": whether a hospital itself owes its patients a fiduciary duty. Id. at 785. The Court observed that courts addressing that question elsewhere generally had found no such duty "absent vicarious liability," and that the plaintiff appeared to concede the point by arguing only that the hospital was liable under respondeat superior. Id. at 785–86. The Court therefore "was not inclined to find as a matter of law that VUMC has a fiduciary duty to its patients absent vicarious liability." Id. at 786.

Nelson does not allege that AAGA or MCDH is vicariously liable for a fiduciary breach committed by one of its employees. Instead, she alleges that AAGA and MCDH themselves had a fiduciary relationship with her based on their dominion and control over her private information. The district court in Cahill addressed the same theory in a substantially similar context. There, the district court dismissed the breach-of-fiduciary-duty claim because the plaintiffs did "not allege there was a dynamic of dominion or control in the relationship between the parties" or "facts to suggest Defendant was aware of the existence of a relationship of special trust or confidence." Cahill, 2024 WL 4311648, at *14.

Nelson plausibly alleges both here. She alleges that AAGA and MCDH took "possession and control" of her and the putative class members' private information and that their failure to

safeguard it "betrayed" their trust. (Doc. No. 1 ¶¶ 8–9). She specifically alleges that AAGA and MCDH "stood in a position of trust and confidence." (Id. ¶ 238). She further alleges that they had "the ability to protect Plaintiff's and Class Members' Private Information in Defendants [sic] shared control, and the unique knowledge regarding Defendants' joint cybersecurity practices, whereas Plaintiff and Class Members lacked such abilities and knowledge." (Id. ¶ 239). Consistent with those allegations, Nelson alleges that she "had no ability to protect" her private information once it was in Defendants' possession and that Defendants "alone had the exclusive ability to implement adequate security measures" to protect it. (Id. ¶¶ 127, 214).

These allegations, construed in Nelson's favor, plausibly establish the dominion and control absent in Cahill. They also plausibly establish that Nelson and AAGA and MCDH understood that her private information had been entrusted to them in a relationship of special trust or confidence. Nelson plausibly alleges a confidential relationship giving rise to a fiduciary duty between her and AAGA and MCDH.

F. Unjust Enrichment

Defendants argue that Nelson's unjust enrichment claim fails because she does not allege that she conferred any benefit on Defendants that they unjustly retained. (Doc. No. 21 at 19–20). Specifically, they argue that Nelson received the healthcare services for which she paid, and that Defendants' alleged savings from inadequate cybersecurity and use of her private information do not constitute benefits unjustly retained at her expense. (Id.)

The elements of an unjust enrichment claim are: (1) "[a] benefit conferred upon the defendant by the plaintiff"; (2) "appreciation by the defendant of such benefit"; and (3) "acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." Wilson Bank & Tr. v. Consol. Util. Dist., 2022

WL 2092540, at *10 (Tenn. Ct. App. June 10, 2022) (citation omitted). "The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." Id.

Nelson alleges that Defendants received monetary benefits from using her private information for their business purposes, received some portion of the money she paid for healthcare services, and saved costs by failing to spend enough on data security. (Doc. No. 1 ¶¶ 248–55). After Nelson provided her Private Information "as a condition and in exchange for receiving healthcare services" (id. ¶ 82), however, she does not allege that Defendants failed to provide those services. She therefore alleges no unaccounted-for benefit that Defendants retained at her expense. See Cahill, 2024 WL 4311648, at *12–13 (dismissing unjust enrichment claim where plaintiffs received the medical services for which they provided their PII and paid, leaving "no unaccounted-for benefit" retained by the defendant). Her allegations that Defendants profited from using her information or saved money by inadequately protecting it do not change that conclusion. Accordingly, Nelson fails to state a claim for unjust enrichment.

## IV. Conclusion

For the reasons set forth above, the motion to dismiss (Doc. No. 20) will be granted in part and denied in part. The motion to strike (Doc. No. 20) will be denied.

An appropriate order will enter.

Waverly D. Crenshaw, Jr.

WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE


Case 3:25-cv-00751 Document 36 Filed 09/22/26 Page 24 of 24 PageID #: 356